DONOVAN, SECRETARY OF LABOR *v.* DEWEY ET AL.

No. 80–901.   Argued April 28, 1981—Decided June 17, 1981

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, BLACKMUN, POWELL, and STEVENS, JJ., joined. STEVENS, J., filed a concurring opinion, *post,* p. 606. REHNQUIST, J., filed an opinion concurring in the judgment, *post,* p. 608. STEWART, J., filed a dissenting opinion, *post,* p. 609.

*Deputy Solicitor General Geller* argued the cause for appellant. With him on the briefs were *Solicitor General McCree, Acting Assistant Attorney General Martin, Elliott Schulder,* and *William Kanter.*

*Francis R. Croak* argued the cause for appellees. With him on the brief was *Jan E. Kearney.**

---

*Briefs of *amici curiae* urging reversal were filed by *J. Albert Woll, Laurence Gold,* and *Marsha S. Berzon* for the American Federation of Labor and Congress of Industrial Organizations; and by *Fred Okrand, Mark D. Rosenbaum,* and *Dennis M. Perluss* for the ACLU Foundation of Southern California.

*Wayne E. Bingham* and *W. Thomas Martin, Jr.,* filed a brief for Kent Nowlin Construction, Inc., et al. as *amici curiae* urging affirmance.

JUSTICE MARSHALL delivered the opinion of the Court.

In this case we consider whether § 103 (a) of the Federal Mine Safety and Health Act of 1977, 30 U. S. C. § 813 (a) (1976 ed., Supp. III), which authorizes warrantless inspections of underground and surface mines, violates the Fourth Amendment. Concluding that searches conducted pursuant to this provision are reasonable within the meaning of the Fourth Amendment, we reverse the judgment of the District Court for the Eastern District of Wisconsin invalidating the statute.

I

The Federal Mine Safety and Health Act of 1977, 91 Stat. 1290, 30 U. S. C. § 801 *et seq.* (1976 ed. and Supp. III), requires the Secretary of Labor to develop detailed mandatory health and safety standards to govern the operation of the Nation's mines. 30 U. S. C. § 811 (1976 ed., Supp. III).[1] Section 103 (a) of the Act, 30 U. S. C. § 813 (a) (1976 ed., Supp. III), provides that federal mine inspectors are to inspect underground mines at least four times per year and surface mines at least twice a year to insure compliance with these standards, and to make followup inspections to determine whether previously discovered violations have been corrected. This section also grants mine inspectors "a right of entry to, upon, or through any coal or other mine"[2] and states that "no advance notice of an inspection shall be provided to any person." If a mine operator refuses to allow a warrantless inspection conducted pursuant to § 103 (a), the Secretary

---

[1] The Act supersedes the Federal Coal Mine Health and Safety Act of 1969, formerly 30 U. S. C. § 801 *et seq.*, and repeals and replaces the Federal Metal and Nonmetallic Mine Safety Act of 1966, formerly 30 U. S. C. § 721 *et seq.*

[2] The Act defines "coal or other mine" to include "an area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground." 30 U. S. C. § 802 (h) (1) (1976 ed., Supp. III). It is undisputed that the quarry operated by appellee company falls within this definition.

is authorized to institute a civil action to obtain injunctive or other appropriate relief. 30 U. S. C. § 818 (a)(1)(C) (1976 ed., Supp. III).

In July 1978, a federal mine inspector attempted to inspect quarries owned by appellee Waukesha Lime and Stone Co. in order to determine whether all 25 safety and health violations uncovered during a prior inspection had been corrected. After the inspector had been on the site for about an hour, Waukesha's president, appellee Douglas Dewey, refused to allow the inspection to continue unless the inspector first obtain a search warrant. The inspector issued a citation to Waukesha for terminating the inspection,[3] and the Secretary subsequently filed this civil action in the District Court for the Eastern District of Wisconsin seeking to enjoin appellees from refusing to permit warrantless searches of the Waukesha facility.

The District Court granted summary judgment in favor of appellees on the ground that the Fourth Amendment prohibited the warrantless searches of stone quarries authorized by § 103 (a) of the Act.[4] 493 F. Supp. 963 (1980). The

---

[3] The Act provides that the Secretary shall issue citations and propose civil penalties for violations of the Act or standards promulgated under the Act. 30 U. S. C. §§ 814 (a), 820 (a) (1976 ed., Supp. III). The Secretary's regulations call for issuance of a citation and the assessment of a civil penalty for denial of entry. 30 CFR § 100.4 (1980). The Act also allows a mine operator to contest any citation in a hearing before an administrative law judge, whose decision is subject to discretionary review by the Mine Safety and Health Review Commission. 30 U. S. C. §§ 815 (d), 823 (d) (1976 ed., Supp. III). The operator thereafter is entitled to review of a final administrative ruling in the appropriate court of appeals. 30 U. S. C. § 816 (1976 ed., Supp. III).

In this case, the Administrative Law Judge upheld a $1,000 civil penalty proposed by the Secretary. This decision is currently under review by the Mine Safety and Health Review Commission.

[4] Although the District Court limited its holding to the constitutionality of § 103 (a) as applied to warrantless inspections of stone quarries, the Act makes no distinction as to the type of mine to be inspected, and our

Secretary appealed directly to this Court pursuant to 28 U. S. C. § 1252. Because the District Court's ruling invalidated an important provision of the Mine Safety and Health Act, we noted probable jurisdiction.[5] *Sub nom. Marshall* v. *Dewey*, 449 U. S. 1122 (1981).

## II

Our prior cases have established that the Fourth Amendment's prohibition against unreasonable searches applies to administrative inspections of private commercial property. *Marshall* v. *Barlow's, Inc.*, 436 U. S. 307 (1978); *See* v. *City of Seattle*, 387 U. S. 541 (1967). However, unlike searches of private homes, which generally must be conducted pursuant to a warrant in order to be reasonable under the Fourth Amendment,[6] legislative schemes authorizing warrantless administrative searches of commercial property do not necessarily violate the Fourth Amendment. See, *e. g., United States* v. *Biswell*, 406 U. S. 311 (1972); *Colonnade Catering Corp.* v. *United States*, 397 U. S. 72 (1970). The greater latitude to conduct warrantless inspections of commercial property reflects the fact that the expectation of privacy that the owner of commercial property enjoys in such property differs significantly from the sanctity accorded an

conclusions here apply equally to all warrantless inspections authorized by the Act.

[5] Three Courts of Appeals have upheld the warrantless inspection provisions of the Act as they apply to quarry operations similar to appellees' facility. See *Marshall* v. *Texoline Co.*, 612 F. 2d 935 (CA5 1980); *Marshall* v. *Nolichuckey Sand Co.*, 606 F. 2d 693 (CA6 1979), cert. denied, 446 U. S. 908 (1980); *Marshall* v. *Stoudt's Ferry Preparation Co.*, 602 F. 2d 589 (CA3 1979), cert. denied, 444 U. S. 1015 (1980).

[6] Absent consent or exigent circumstances, a private home may not be entered to conduct a search or effect an arrest without a warrant. *Steagald* v. *United States*, 451 U. S. 204 (1981); *Payton* v. *New York*, 445 U. S. 573 (1980); *Johnson* v. *United States*, 333 U. S. 10 (1948). Of course, these same restrictions pertain when commercial property is searched for contraband or evidence of crime. *G. M. Leasing Corp.* v. *United States*, 429 U. S. 338, 352–359 (1977).

individual's home, and that this privacy interest may, in certain circumstances, be adequately protected by regulatory schemes authorizing warrantless inspections. *United States* v. *Biswell, supra,* at 316.

The interest of the owner of commercial property is not one in being free from any inspections. Congress has broad authority to regulate commercial enterprises engaged in or affecting interstate commerce, and an inspection program may in some cases be a necessary component of federal regulation. Rather, the Fourth Amendment protects the interest of the owner of property in being free from *unreasonable* intrusions onto his property by agents of the government. Inspections of commercial property may be unreasonable if they are not authorized by law or are unnecessary for the furtherance of federal interests. *Colonnade Catering Corp.* v. *United States, supra,* at 77. Similarly, warrantless inspections of commercial property may be constitutionally objectionable if their occurrence is so random, infrequent, or unpredictable that the owner, for all practical purposes, has no real expectation that his property will from time to time be inspected by government officials. *Marshall* v. *Barlow's, Inc., supra, at* 323. "Where Congress has authorized inspection but made no rules governing the procedures that inspectors must follow, the Fourth Amendment and its various restrictive rules apply." *Colonnade Corp.* v. *United States, supra,* at 77. In such cases, a warrant may be necessary to protect the owner from the "unbridled discretion [of] executive and administrative officers," *Marshall* v. *Barlow's, Inc., supra,* at 323, by assuring him that "reasonable legislative or administrative standards for conducting an . . . inspection are satisfied with respect to a particular [establishment]." *Camara* v. *Municipal Court,* 387 U. S. 523, 538 (1967).

However, the assurance of regularity provided by a warrant may be unnecessary under certain inspection schemes. Thus, in *Colonnade Corp.* v. *United States,* we recognized that because the alcoholic beverage industry had long been

"subject to close supervision and inspection," Congress enjoyed "broad power to design such powers of inspection . . . as it deems necessary to meet the evils at hand." 397 U. S., at 76–77. Similarly, in *United States* v. *Biswell,* this Court concluded that the Gun Control Act of 1968, 18 U. S. C. § 921 *et seq.,* provided a sufficiently comprehensive and predictable inspection scheme that the warrantless inspections mandated under the statute did not violate the Fourth Amendment. After describing the strong federal interest in conducting unannounced, warrantless inspections, we noted:

> "It is also plain that inspections for compliance with the Gun Control Act pose only limited threats to the dealer's justifiable expectations of privacy. When a dealer chooses to engage in this pervasively regulated business . . . , he does so with the knowledge that his records, firearms, and ammunition will be subject to effective inspection. . . . The dealer is not left to wonder about the purposes of the inspector or the limits of his task." 406 U. S., at 316.

These decisions make clear that a warrant may not be constitutionally required when Congress has reasonably determined that warrantless searches are necessary to further a regulatory scheme and the federal regulatory presence is sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes.

We re-emphasized this exception to the warrant requirement most recently in *Marshall* v. *Barlow's, Inc.* In that case, we held that absent consent a warrant was constitutionally required in order to conduct administrative inspections under § 8 (a) of the Occupational Safety and Health Act of 1970, 29 U. S. C. § 657 (a). That statute imposes health and safety standards on all businesses engaged in or affecting interstate commerce that have employees, 29 U. S. C.

§ 652 (5), and authorizes representatives of the Secretary to conduct inspections to ensure compliance with the Act. 29 U. S. C. § 657 (a). However, the Act fails to tailor the scope and frequency of such administrative inspections to the particular health and safety concerns posed by the numerous and varied businesses regulated by the statute. Instead, the Act flatly authorizes administrative inspections of "any factory, plant, establishment, construction site, or other area, workplace, or environment where work is performed by an employee of an employer" and empowers inspectors conducting such searches to investigate "any such place of employment and all pertinent conditions, structures, machines, apparatus, devices, equipment, and materials therein, and to question privately any such employer, owner, operator, agent, or employee." *Ibid.* Similarly, the Act does not provide any standards to guide inspectors either in their selection of establishments to be searched or in the exercise of their authority to search. The statute instead simply provides that such searches must be performed "at . . . reasonable times, and within reasonable limits and in a reasonable manner." *Ibid.*

In assessing this regulatory scheme, this Court found that the provision authorizing administrative searches "devolves almost unbridled discretion upon executive and administrative officers, particularly those in the field, as to when to search and whom to search." 436 U. S., at 323. Accordingly, we concluded that a warrant was constitutionally required to assure a nonconsenting owner, who may have little real expectation that his business will be subject to inspection, that the contemplated search was "authorized by statute, and . . . pursuant to an administrative plan containing specific neutral criteria." *Ibid.* However, we expressly limited our holding to the inspection provisions of the Occupational Safety and Health Act, noting that the "reasonableness of a warrantless search . . . will depend upon the specific enforcement needs and privacy guarantees of each statute" and that some statutes "apply only to a single industry, where

regulations might already be so pervasive that a *Colonnade-Biswell* exception to the warrant requirement could apply." *Id.,* at 321.

Applying this analysis to the case before us, we conclude that the warrantless inspections required by the Mine Safety and Health Act do not offend the Fourth Amendment. As an initial matter, it is undisputed that there is a substantial federal interest in improving the health and safety conditions in the Nation's underground and surface mines. In enacting the statute, Congress was plainly aware that the mining industry is among the most hazardous in the country and that the poor health and safety record of this industry has significant deleterious effects on interstate commerce.[7] Nor is it seriously contested that Congress in this case could reasonably determine, as it did with respect to the Gun Control Act in *Biswell,* that a system of warrantless inspections was

---

[7] In the preamble to the Act, Congress declared:

"[T]here is an urgent need to provide more effective means and measures for improving the working conditions and practices in the Nation's coal or other mines in order to prevent death and serious physical harm, and in order to prevent occupational diseases originating in such mines. . . .

"[T]he existence of unsafe and unhealthful conditions and practices in the Nation's coal or other mines is a serious impediment to the future growth of the coal and other mining industry and cannot be tolerated. . . .

.    .    .    .    .

"[T]he disruption of production and the loss of income to operators and miners as a result of coal or other mine accidents or occupationally caused diseases unduly impedes and burdens commerce." 30 U. S. C. §§ 801 (c), (d), (f).

These congressional findings were based on extensive evidence showing that the mining industry was among the most hazardous of the Nation's industries. See S. Rep. No. 95–181 (1977); H. R. Rep. No. 95–312 (1977). Although Congress did not make explicit reference to stone quarries in these findings, stone quarries were deliberately included within the scope of the statute. Since the Mine Safety and Health Act, unlike the Occupational Safety and Health Act, is narrowly and explicitly directed at inherently dangerous industrial activity, the inclusion of stone quarries in the statute is presumptively equivalent to a finding that the stone quarrying industry is inherently dangerous.

necessary "if the law is to be properly enforced and inspection made effective." *United States* v. *Biswell*, 406 U. S., at 316. In designing an inspection program, Congress expressly recognized that a warrant requirement could significantly frustrate effective enforcement of the Act. Thus, it provided in § 103 (a) of the Act that "no advance notice of an inspection shall be provided to any person." In explaining this provision, the Senate Report notes:

> "[I]n [light] of the notorious ease with which many safety or health hazards may be concealed if advance warning of inspection is obtained, a warrant requirement would seriously undercut this Act's objectives." S. Rep. No. 95–181, p. 27 (1977).

We see no reason not to defer to this legislative determination. Here, as in *Biswell*, Congress could properly conclude: "[I]f inspection is to be effective and serve as a credible deterrent, unannounced, even frequent, inspections are essential. In this context, the prerequisite of a warrant could easily frustrate inspection." 406 U. S., at 316.

Because a warrant requirement clearly might impede the "specific enforcement needs" of the Act, *Marshall* v. *Barlow's, Inc.*, 436 U. S., at 321, the only real issue before us is whether the statute's inspection program, in terms of the certainty and regularity of its application, provides a constitutionally adequate substitute for a warrant. We believe that it does. Unlike the statute at issue in *Barlow's*, the Mine Safety and Health Act applies to industrial activity with a notorious history of serious accidents and unhealthful working conditions. The Act is specifically tailored to address those concerns,[8] and the regulation of mines it imposes is sufficiently pervasive and defined that the owner of such a facility cannot help but be aware that he "will be subject to effective inspection." *United States* v. *Biswell, supra,* at 316. First, the Act re-

---

[8] Cf. H. R. Rep. No. 95–312, *supra,* at 1 (mining operations are "so unique, so complex, and so hazardous as to not fit neatly under the Occupational Safety and Health Act").

quires inspection of *all* mines and specifically defines the frequency of inspection. Representatives of the Secretary must inspect all surface mines at least twice annually and all underground mines at least four times annually. 30 U. S. C. § 813 (a) (1976 ed., Supp. III). Similarly, all mining operations that generate explosive gases must be inspected at irregular 5-, 10-, or 15-day intervals. § 813 (i). Moreover, the Secretary must conduct followup inspections of mines where violations of the Act have previously been discovered, § 813 (a), and must inspect a mine immediately if notified by a miner or a miner's representative that a violation of the Act or an imminently dangerous condition exists. § 813 (g).[9] Second, the standards with which a mine operator is required to comply are all specifically set forth in the Act or in Title 30 of the Code of Federal Regulations. Indeed, the Act requires that the Secretary inform mine operators of all standards proposed pursuant to the Act. § 811 (e). Thus, rather than leaving the frequency and purpose of inspections to the unchecked discretion of Government officers, the Act establishes a predictable and guided federal regulatory presence. Like the gun dealer in *Biswell*, the operator of a mine "is not left to wonder about the purposes of the inspector or the limits of his task." 406 U. S., at 316.

Finally, the Act provides a specific mechanism for accommodating any special privacy concerns that a specific mine operator might have. The Act prohibits forcible entries, and instead requires the Secretary, when refused entry onto a mining facility, to file a civil action in federal court to obtain an injunction against future refusals. 30 U. S. C. § 818 (a) (1976 ed., Supp. III). This proceeding provides an

---

[9] In contrast, the inspection scheme considered in *Barlow's* did not require the periodic inspection of businesses covered by the Occupational Safety and Health Act, and instead left the decision to inspect within the broad discretion of agency officials. Thus, when a Government official attempted to inspect the facility in that case, the owner had no indication of "why an inspection of [his] establishment was within the program." 436 U. S., at 323, n. 20.

adequate forum for the mineowner to show that a specific search is outside the federal regulatory authority, or to seek from the district court an order accommodating any unusual privacy interests that the mineowner might have. See, *e. g., Marshall* v. *Stoudt's Ferry Preparation Co.,* 602 F. 2d 589, 594 (CA3 1979) (inspectors ordered to keep confidential mine's trade secrets), cert. denied, 444 U. S. 1015 (1980).

Under these circumstances, it is difficult to see what additional protection a warrant requirement would provide. The Act itself clearly notifies the operator that inspections will be performed on a regular basis. Moreover, the Act and the regulations issued pursuant to it inform the operator of what health and safety standards must be met in order to be in compliance with the statute. The discretion of Government officials to determine what facilities to search and what violations to search for is thus directly curtailed by the regulatory scheme. In addition, the statute itself embodies a means by which any special Fourth Amendment interests can be accommodated. Accordingly, we conclude that the general program of warrantless inspections authorized by § 103 (a) of the Act does not violate the Fourth Amendment.

Appellees contend, however, that even if § 103 (a) is constitutional as applied to most segments of the mining industry, it nonetheless violates the Fourth Amendment as applied to authorize warrantless inspections of stone quarries. Appellees' argument essentially tracks the reasoning of the court below. That court, while expressly acknowledging our decisions in *Colonnade* and *Biswell,* found the exception to the warrant requirement defined in those cases to be inapplicable solely because surface quarries, which came under federal regulation in 1966,[10] do "not have a long tradition of government regulation." 493 F. Supp., at 964. To be sure, in *Colonnade* this Court referred to "the long history of the

---

[10] Stone quarries were first subjected to federal health and safety inspections under the Federal Metal and Nonmetallic Mine Safety Act of 1966, 30 U. S. C. §§ 723, 724.

regulation of the liquor industry," 397 U. S., at 75, and more recently in *Marshall* v. *Barlow's, Inc.*, 436 U. S., at 313, we noted that a "long tradition of close government supervision" militated against imposition of a warrant requirement. However, as previously noted, see *supra,* at 599, it is the pervasiveness and regularity of the federal regulation that ultimately determines whether a warrant is necessary to render an inspection program reasonable under the Fourth Amendment. Thus in *United States* v. *Biswell,* this Court upheld the warrantless search provisions of the Gun Control Act of 1968 despite the fact that "[f]ederal regulation of the interstate traffic in firearms is not as deeply rooted in history as is governmental control of the liquor industry." 406 U. S., at 315. Of course, the duration of a particular regulatory scheme will often be an important factor in determining whether it is sufficiently pervasive to make the imposition of a warrant requirement unnecessary. But if the length of regulation were the only criterion, absurd results would occur. Under appellees' view, new or emerging industries, including ones such as the nuclear power industry that pose enormous potential safety and health problems, could never be subject to warrantless searches even under the most carefully structured inspection program simply because of the recent vintage of regulation.

The Fourth Amendment's central concept of reasonableness will not tolerate such arbitrary results, and we therefore conclude that warrantless inspection of stone quarries, like similar inspections of other mines covered by the Act, are constitutionally permissible. The judgment of the District Court is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

JUSTICE STEVENS, concurring.

Like JUSTICE STEWART, I believe the Court erred in *Camara* v. *Municipal Court,* 387 U. S. 523, when it overruled *Frank* v.

*Maryland,* 359 U. S. 360.   See *post,* at 609 (dissenting opinion).
I also share JUSTICE STEWART's conviction that each of us
has a duty to accept the law as it is; disagreement with the
holding in a prior case is not a sufficient reason for refusing
to honor it.[1]   Unlike him, however, I also think the Court
erred in *Marshall* v. *Barlow's, Inc.,* 436 U. S. 307, when it
concluded that *Camara* required it to invalidate the safety
inspection program authorized by Congress in the Occupa-
tional Safety and Health Act.   As I explained in my dissent
in that case, neither the longevity of a regulatory program nor
a businessman's implied consent to regulations imposed by
the Federal Government determines the reasonableness of a
congressional judgment that the public interest in occupa-
tional health or safety justifies a program of warrantless in-
spections of commercial premises.   See 436 U. S., at 336–339
(STEVENS, J., dissenting).

JUSTICE STEWART has cogently demonstrated that the ra-
tionale of today's decision is much closer to the reasoning in
my dissent than to the reasoning in the majority opinion in
*Barlow's, Inc.*   Nevertheless, I am not persuaded that the
*holding* in *Barlow's, Inc.,* requires the Court to invalidate the
program of mine inspections authorized by the statute we
construe today.[2]   I accept the Court's explanation of the dif-
ferences between the scope of these statutes as sufficient to
support a different result in this case.   Because I agree with
today's majority that the cases are distinguishable, I need not
confront the more difficult question whether *Camara* repre-
sented such a fundamental misreading of the Fourth Amend-
ment that it should be overruled.   I would merely observe
that that option is more viable today than when some of the

---

[1] See *Florida Dept. of Health & Rehabilitative Services* v. *Florida Nursing Home Assn.,* 450 U. S. 147, 151 (STEVENS, J., concurring).

[2] I do not agree with JUSTICE STEWART's view that the doctrine of *stare decisis* requires that we respect dictum unnecessary to the decision in *Barlow's, Inc.*   Cf. *McDaniel* v. *Sanchez, ante,* p. 154 (STEWART, J., dissenting).

reasoning that would support it could only be found in dissenting opinions, see 387 U. S., at 546–555 (Clark, J., dissenting); 436 U. S., at 325–339 (STEVENS, J., dissenting), or in the earlier Court opinion in *Frank* that had itself been overruled in *Camara*.

JUSTICE REHNQUIST, concurring in the judgment.

Our prior cases hold that, absent consent or exigent circumstances, the government must obtain a warrant to conduct a search or effect an arrest in a private home. *Steagald* v. *United States,* 451 U. S. 204 (1981); *Payton* v. *New York,* 445 U. S. 573 (1980). This case, however, involves the search of commercial property. Though the proprietor of commercial property is protected from unreasonable intrusions by governmental agents, the Court correctly notes that "legislative schemes authorizing warrantless administrative searches of commercial property do not necessarily violate the Fourth Amendment." *Ante,* at 598.

I do not believe, however, that the warrantless entry authorized by Congress in this case, § 103 (a) of the Federal Mine Safety and Health Act of 1977, can be justified by the Court's rationale. The Court holds that warrantless searches of stone quarries are permitted because the mining industry has been pervasively regulated. But I have no doubt that had Congress enacted a criminal statute similar to that involved here—authorizing, for example, unannounced warrantless searches of property reasonably thought to house unlawful drug activity—the warrantless search would be struck down under our existing Fourth Amendment line of decisions. This Court would invalidate the search despite the fact that Congress has a strong interest in regulating and preventing drug-related crime and has in fact pervasively regulated such crime for a longer period of time than it has regulated mining.

I nonetheless concur in the judgment of the Court. As far as I can tell, the stone quarry here was largely visible to the naked eye without entrance onto the company's property.

As this Court has held, the "protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers, and effects,' is not extended to the open fields." *Hester* v. *United States,* 265 U. S. 57, 59 (1924). I necessarily reserve judgment on the extent to which the Fourth Amendment would prevent the implementation of § 103 (a) of the Act in the absence of the particular fact situation presented here.

JUSTICE STEWART, dissenting.

In *Frank* v. *Maryland,* 359 U. S. 360, the Court concluded that warrantless administrative inspections are not subject to the restrictions that the Fourth and Fourteenth Amendments place upon conventional searches. The *Frank* decision was overruled eight years later in *Camara* v. *Municipal Court,* 387 U. S. 523, over the dissent of three Members of the Court, of whom I was one. I believed then that the *Frank* case had been correctly decided, and that warrantless health and safety inspections do not "requir[e] . . . the safeguards necessary for a search of evidence of criminal acts." *Frank, supra,* at 372 (dissenting opinion).[1]

I must, nonetheless, accept the law as it is, and the law is now established that administrative inspections are searches within the meaning of the Fourth Amendment. As such, warrantless administrative inspections of private property without consent, are, like other searches, constitutionally invalid except in a few precisely defined circumstances. *Camara, supra,* at 528–529. This principle was re-emphasized most recently in *Marshall* v. *Barlow's, Inc.,* 436 U. S. 307, a case in which the Court carefully and explicitly defined the scope of the exception to the general rule of *Camara:* a search warrant is required for administrative inspections ex-

---

[1] This is not to say that evidence of criminality seized in the course of a warrantless administrative inspection should not be excluded at a criminal trial.

cept in those businesses with "a long tradition of close government supervision, of which any person who chooses to enter such a business must already be aware." 436 U. S., at 313. Because the Court today departs far from this principle, I respectfully dissent.

## A

In *Camara,* the Court announced the general rule that a warrantless inspection of a private dwelling by municipal administrative officers without proper consent is unconstitutional "unless it has been authorized by a valid search warrant." 387 U. S., at 528–529. In the companion case, *See* v. *City of Seattle,* 387 U. S. 541, the Court held that the general rule of *Camara* applies also to administrative inspections of commercial premises.

Until today, exceptions to the general rule have been found in only two cases. In *Colonnade Catering Corp.* v. *United States,* 397 U. S. 72, the Court upheld against constitutional attack a statute that authorized warrantless searches of a liquor licensee's premises by Internal Revenue agents. And in *United States* v. *Biswell,* 406 U. S. 311, the Court held that federal Treasury agents could search the premises of a licensed gun dealer to determine whether he was in compliance with the Gun Control Act.

In *Marshall* v. *Barlow's, Inc., supra,* the Court made clear that *Colonnade* and *Biswell* were only limited exceptions to the general rule of *Camara,* and that they did not signal a trend away from that rule. The Court stated that "unless some recognized exception to the warrant requirement applies," warrants for administrative inspections are mandatory. 436 U. S., at 313.

The *Barlow's* Court could not have been more clear in its explanation for and description of the *Colonnade-Biswell* exception: "*The* element that distinguishes these enterprises from ordinary businesses is a long tradition of close government supervision, of which any person who chooses to enter such a business must be aware." 436 U. S., at 313 (emphasis

added).  The rationale for the exception was unmistakably that of implied consent.  The Court reasoned that " '[t]he businessman [in an industry with a long tradition of close government supervision] in effect consents to the restrictions placed upon him.' " [2] (quoting *Almeida-Sanchez* v. *United States,* 413 U. S. 266, 271).

Thus, as explained in *Barlow's,* the *Colonnade-Biswell* exception is a single and narrow one: the exception applies to businesses that are both pervasively regulated *and* have a long history of regulation.  Today the Court conveniently discards the latter portion of the exception.[3]  Yet the very

---

[2] In *Barlow's,* consent could not be found for inspections of the premises of the myriad businesses regulated by the Occupational Safety and Health Administration.  The Court was unmoved by the Government's claims that warrantless inspections were necessary for effective enforcement, and that warrants would impose serious burdens upon the inspection system and the courts.  436 U. S., at 316–320.  And the Court found similarly unpersuasive the Secretary of Labor's argument that a warrant requirement for OSHA inspections would mean that "as a practical matter, warrantless-search provisions in other regulatory statutes are also constitutionally infirm," *id.,* at 321.

[3] The Court's recasting of what the Court said in *Barlow's* is remarkable.  After discussing *Colonnade* and *Biswell,* it states that those decisions create an exception to the warrant requirement when "Congress has reasonably determined that warrantless searches are necessary to further a regulatory scheme and the federal regulatory presence is sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes."  *Ante,* at 600.  It then says that "this" exception to the warrant requirement was re-emphasized in *Barlow's.  Ante,* at 600.

Nothing of the sort was re-emphasized in *Barlow's.*  Rather, the Court re-emphasized that "[t]he element that distinguishes these enterprises from ordinary businesses is a long tradition of close government supervision, of which any person who chooses to enter such a business must . . . be aware."  436 U. S., at 313.

The Court today does not, to be sure, rid its reinterpretation of *Colonnade* and *Biswell* of all traces of implied consent.  It says that under its new test, "the owner . . . cannot help but be aware that his property will be subject to periodic inspections for specific purposes."  *Ante,* at 600.  But, as the Court must realize, this purported limitation is meaning-

rationale for the exception—that the "businessman . . . in effect consents to the restrictions placed upon him"—disappears without it. It can hardly be said that a businessman consents to restrictions on his business when those restrictions are not imposed until *after* he has entered the business. Yet, because it does not overrule *Barlow's*, that is precisely what the Court says today to many stone quarry operators.[4]

Under the peculiar logic of today's opinion, the scope of the Fourth Amendment diminishes as the power of governmental regulation increases. Yet I would have supposed that the mandates of the Fourth Amendment demand heightened, not lowered, respect, as the intrusive regulatory authority of government expands.

## B

Because *Barlow's* states that the *Colonnade-Biswell* exception applies only when business is both pervasively regulated and has a long tradition of regulation, it follows that the exception does not apply to stone quarries, and that the Fourth Amendment requires that an inspection that is not consented to can be made only under the authority of a search warrant.[5]

---

less. The Court never explains how operators of stone quarries could possibly be aware that the quarries would be subject to warrantless inspections until Congress told them they would be.

[4] The Court of Appeals for the Ninth Circuit correctly rejected the notion that the pervasiveness of regulation alone is enough to vitiate a quarry operator's reasonable expectation of privacy: "It would be far more accurate to state that [the] legislation and regulations . . . 'entered' [the operator's] business activity" than to state that the operator "subject[ed] himself to governmental supervision and regulation." *Marshall* v. *Wait*, 628 F. 2d 1255, 1259.

[5] Warrants are issued *ex parte*. If a warrant were sought after a mine operator's refusal to permit inspection, the time of execution of the warrant would not have to be made known to the operator. *Barlow's*, 436 U. S., at 320. And when it was anticipated that consent would not be given for a search, a warrant could be issued in accordance with an administrative plan based on specific neutral criteria in advance of the

Although quarries have existed at least since the beginning of the Republic, the District Court properly noted that it was only in 1966, when Congress added them to the scope of the Mine Safety and Health Act, that they became pervasively regulated. 493 F. Supp. 963, 965–966.

As I read today's opinion, Congress is left free to avoid the Fourth Amendment industry by industry even though the Court held in *Barlow's* that Congress could not avoid that Amendment all at once.[6] Congress after today can de-

---

planned inspection. The Court's expressed fear that the obtaining of a warrant would give advance notice to a quarry operator of a forthcoming inspection is thus groundless.

Contrary to the Court's expressed belief today, *ante,* at 604–605, a warrant would not be an empty gesture, but would assure the quarry operator of the authority for the search and advise him of its scope and objectives. A warrant protects the proprietor's privacy interests by assuring him that a neutral judicial officer has reviewed the decision to inspect and found it "reasonable under the Constitution, . . . authorized by statute, and [made] pursuant to an administrative plan containing specific neutral criteria." *Barlow's,* 436 U. S., at 323. On the other hand, warrantless inspections will allow inspectors "almost unbridled discretion . . . as to when to search and whom to search," *ibid.,* precisely the type of arbitrary government interference with privacy that, it has been held in this context, the Fourth Amendment was designed to prevent. *Camara,* 387 U. S., at 528; *See* v. *City of Seattle,* 387 U. S. 541, 545.

[6] Factually, *Barlow's* and this case are nearly identical. Both cases arose when a business proprietor refused entry to a federal inspector who had come to conduct a warrantless health and safety inspection of business premises. In both cases, warrantless inspections were authorized by statute, § 8 (a) of the Occupational Health and Safety Act in *Barlow's* and § 103 (a) of the Federal Mine Safety and Health Act of 1977 in this case. Both statutes were similarly intended to improve health and safety standards in the Nation's workplaces, and their language is unmistakably parallel. Compare 29 U. S. C. § 651 *et seq.* with 30 U. S. C. § 801 *et seq.* (1976 ed., Supp. III).

Moreover, *Barlow's* cannot be distinguished from this case because MSHA relates to a specific industry, whereas the Occupational Safety and Health Act sought to regulate a far broader range of workplaces. MSHA, like the Occupational Safety and Health Act, relates to many different industries with widely disparate characteristics and occupational injury

fine any industry as dangerous, regulate it substantially, and provide for warrantless inspections of its members. But, because I do not believe that Congress can, by legislative fiat, rob the members of any industry of their constitutional protection, I dissent from the opinion and judgment of the Court.

---

rates. Limestone quarries, sand and gravel operations, surface operations, and various noncoal underground mines are all quite distinct, and cannot be equivalent for constitutional purposes to underground coal mines. The Court today does not so much as mention the voluminous materials submitted by appellees and *amici* that show this to be true.