549 So.2d 872 (1989)
In the Matter of MULLINS & PRITCHARD, INC. on Appeal from Proceedings Under Louisiana Environmental Quality Act, La.R.S. 30:1051 et seq.
No. CA 88 1048.
Court of Appeal of Louisiana, First Circuit.
August 1, 1989.
Rehearing Denied October 18, 1989.
*873 James C. Bates, Strain, Dennis, Ellis, Mayhall & Bates, Baton Rouge, for appellant Mullins & Pritchard, Inc.
Ann C. Coco, Baton Rouge, for appellee Dept. of Environmental Quality.
Before COVINGTON, C.J., LOTTINGER and FOIL, JJ.
FOIL, Judge.
In this appeal, appellant challenges the action of the Department of Environmental Quality (DEQ) in assessing penalties against it for impermissible discharges of oil and other wastes at its oilfield production facilities. After a thorough review of the record, we find no error in the action taken by DEQ, and affirm the imposition of penalties.

FACTS
From 1986 through late 1987, appellant, Mullins & Pritchard, owned and operated four hydrocarbon production facilities, referred to as the Hawthorne Lease, the Laura Pailet Lease, the Brady Lease and the L.L. & E. Lease. Mullins & Pritchard sold its rights to three of the leases in October, 1987, and currently operates only the L.L. & E. facility.
Beginning in May, 1986, DEQ inspectors received complaints from the Office of Conservation and a citizens complaint regarding discharges at the facilities. On May 1, 1986, DEQ received a complaint regarding discharge of saltwater at the Hawthorne lease from the Office of Conservation, and DEQ inspector Charles Melchoir, along with another Conservation official, inspected the site the same day. Mr. Melchoir found, among other things, that a valve on a glycol unit had been left open, and a discharge was seeping from it. He also found oilfield waste seeping from a burn pit and a discharge escaping from a reserve pit. He further noted an orange color in *874 the reserve pit, which he attributed to the presence of emulsified oil and possibly chloride. Finally, he observed a break in the pit levee, and found emulsified oil escaping from both pits into the adjacent swamp. He took samples of the various discharges. Mr. Melchoir testified that no one was at the site at the time of the inspection, and therefore, he was unable to provide the owner with split samples, as is the usual procedure of DEQ inspectors. He called one of Mullins & Pritchard's partners the next day, informing him of his findings and arranged to meet with its general manager. Mr. Melchoir inspected the site two additional times that month, and was satisfied with the clean-up efforts of Mullins & Pritchard. A Compliance Order was issued by DEQ on July 11, 1986, ordering Mullins & Pritchard to cease all unpermitted discharges and to conduct appropriate clean-up efforts. Mr. Melchoir visited the site again on October 21, 1987, and found oil stains on the ground, which were caused by a breakage in one of the lines. At this time, the facility had been sold to LaStrada Oil and Gas Ltd., which stated that Mullins & Pritchard was responsible for the problem prior to the sale, and it was attempting to clean up the waste.
Nathan Levy, another DEQ inspector, testified that he visited the Laura Pailet facility on June 27, 1986, in response to a complaint from the Office of Conservation regarding an oil spill and brine discharge. Mr. Levy met Scott Pritchard, Mullin & Pritchard's general manager, at the site. He observed that approximately 50 barrels of oil and brine had spilled onto the ground, attributable to an improperly levied pit which had overflowed, impacting approximately 50 acres of wetlands. He found, among other things, at least nine areas where heavy crude lay on the ground. On follow up inspections, Mr. Levy observed that some of the discharges had been corrected, but still found oil discharges at the site.
Mr. Levy visited the Brady Lease on July 18, 1986, in response to a complaint from the Jefferson Parish Environmental Department that the facility was improperly handling oilfield waste and brine. At the facility, Mr. Levy found several oil and brine discharges into the marsh, and observed black oil in the marsh and on the shoreline behind the facility. He found various parts of the facility covered with oil, and concluded that vegetational growth had been inhibited by frequent discharges. Mr. Levy took samples of the discharges.
The L.L. & E. facility was inspected by Mr. Levy on August 6, 1986, spurned by a citizen complaint lodged with DEQ regarding an overflow of oil from a pit. He found the waste oil pit discharging oil and high chlorides which produced a shallow depression in the marsh, and had overflowed into an access canal.
On October 6, 1986, DEQ issued a Compliance Order to Mullins & Pritchard, resulting from the violations at the Laura Pailet, Brady and L.L. & E. leases, citing that its investigations revealed that Mullins & Pritchard allowed the discharge of oil and other oilfield wastes from the facilities to adjacent areas without an appropriate license or permit in violation of numerous Louisiana environmental regulations. Specifically, DEQ ordered Mullins & Pritchard to immediately cease all unpermitted discharges of oil or other oilfield wastes and required it to "clean up, remove and properly dispose of all oil or other wastes and any materials contaminated by these substances that are the result of discharges from its facilities."
During follow-up inspections of the Laura Pailet, Brady and L.L. & E. leases on January 15, 1987, Mr. Levy found continuing evidence of oil discharges and spillages. Another inspection, conducted on September 18, 1987, revealed evidence of oil discharges at all three sites. With respect to the Brady lease, he noted that little or no effort had been made to remove the spilled oil.
According to Scott Pritchard, various cleanup efforts were undertaken by Mullins & Pritchard in response to the Compliance Orders. At the Laura Pailet site, the oil spill was cleaned with absorbent pads and oilfield trash was removed. At the other sites, Mullins & Pritchard replaced *875 piping, connected drains to vessels and repaired pits. However, with respect to the contamination already caused by the spills at the sites, Mullins & Pritchard did not physically remove any of the oil stained earth or shell, but merely laid new shell wherever oil stains appeared. Mr. Levy, however, related that this measure did not comport with DEQ regulations and the compliance order, which required either the removal of the oil stained materials from the site, or the burning of such materials at the site.
With respect to the procedural background of this case, on March 27, 1987, DEQ issued a Proposed Penalty Notice for the violations and the failure to report the unpermitted discharges to Mullins & Pritchard. A hearing was requested and a Statement of Charges was served on Mullins & Pritchard on September 28, 1987.
The matter came before a hearing officer in November, 1987. The hearing officer found Mullins & Pritchard guilty of illegal discharges in violation of numerous regulatory provisions, and in violation of DEQ's notification procedures. In addition, he found Mullins & Pritchard failed to properly clean up and dispose of the discharged oil field waste at the sites, in contravention of the Compliance Order. The hearing officer assessed a total penalty of $73,034.49 against Mullins & Pritchard. Specifically, the amount of $20,000.00 was assessed for unauthorized discharges; $35,000.00 was charged for the failure to report the unauthorized discharges; $15,000.00 was attributed to the failure to comply with the Compliance Orders; and $3,034.49 was taxed for the costs of enforcement. DEQ adopted the findings, conclusions and sanctions imposed by the hearing officer, ordering Mullins & Pritchard to pay the assessed penalty. Mullins & Pritchard sought review in this Court, asserting numerous challenges to the rulings.

CONSTITUTIONALITY OF LA.R.S. 30:2012
Appellant challenges the constitutionality of La.R.S. 30:2012, which authorizes warrantless inspections of all facilities subject to the environmental regulations. The statute provides, in pertinent part:
§ 2012. Enforcement inspections
A. The protection of the environment and public health requires timely and meaningful inspections of all facilities subject to the provisions of this Subtitle. Inspections of such facilities are essential to assure compliance with this Subtitle and the regulations issued pursuant thereto. The purpose of such inspections is to determine whether any of the following conditions exist:
(1) Environmental standards have been achieved.
(2) There is an emergency under the provisions of this Subtitle.
(3) There is a present or potential danger to the health or environment.
(4) A violation of the provisions of this Subtitle or rules, regulations, or orders issued pursuant thereto has occurred.
(5) Under the provisions of this Subtitle, there is an abandoned waste site.

* * * * * *
C. In order to assure effective enforcement of the provisions of this Subtitle and the rules and regulations issued pursuant thereto, the inspections may be made without obtaining a warrant from the courts.
D. A. monitoring inspection of all facilities operating under authorization derived from this Subtitle shall be made at least once annually. The secretary shall promulgate guidelines for additional monitoring inspections of such facilities based on the type of activity to be monitored, the requirements of the individual regulatory programs, the environmental history of a given facility, and any other relevant environmental, health, or enforcement factors. The guidelines shall provide for reasonable times during which inspections may be conducted. Written notice of the adoption of such guidelines shall be given to each person subject to inspection.
E. Whenever there exists an imminent danger to the environment or health, an emergency under this Subtitle, an abandoned hazardous waste site, or a *876 violation of this Subtitle or the rules or regulations issued pursuant thereto, the secretary may cause a special inspection to be made of the facility where such exigent conditions are reasonably believed to exist. While conducting the inspection the inspector shall inform the owner, operator, or any responsible person at the facility of the particular exigent condition believed to exist. The scope of the inspection shall be limited to those matters which are reasonably related to the exigent condition. However, this limitation shall not preclude the prosecution of any other violation discovered in the course of the investigation.

* * * * * *
Appellant contends the warrantless administrative search scheme violates the protections against unreasonable searches and seizures contained in the Fourth Amendment of the United States Constitution and Article 1, Section 5, of the Louisiana Constitution. It also argues that there were no "exigent circumstances" existing at the facilities to trigger the exigency exception to the warrant requirement, noting that DEQ did not investigate the Brady lease until four days after it received the complaint. Appellant thus contends the DEQ's investigatory searches were unconstitutional and unauthorized, and insists that the results of the samples taken at its facilities should have been suppressed at the hearing.
We note that prior to each inspection, a complaint alleging potential violations of Louisiana's environmental regulations had been lodged with DEQ. The statute specifically authorizes warrantless inspections whenever there exists a reasonable belief of a violation of the environmental rules and regulations. Thus, the searches here were clearly permitted by the statute. We therefore address the claim that the statutory authorization of warrantless administrative searches is unconstitutional.
A recent United States Supreme Court case enunciated the gauge by which to measure the validity of statutory schemes authorizing warrantless administrative searches. In New York v. Burger, 482 U.S. 691, 107 S.Ct 2636, 96 L.Ed 2d 601 (1987), the Court noted that previous jurisprudence has established an exception to the warrant requirement with respect to searches of "pervasively regulated industries." See Donovan v. Dewey, 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981) and cases cited therein. Because of the lessened expectation of privacy an owner or operator of a commercial premises has, the Court has required only that an administrative search satisfy the "reasonableness" requirement of the Fourth Amendment.
In New York v. Burger, supra 107 S.Ct. at 2643, 2644, the Court stated that warrantless searches, in the context of pervasively regulated industries, will be deemed to be reasonable only if three criteria are met. According to the Court, there must first be a "substantial" government interest that informs the regulatory scheme pursuant to which the inspection is made. Second, the warrantless inspections must be "necessary to further [the] regulatory scheme." Third, "the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant." This means, the Court stated, "the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." To fulfill the first requirement, the Court concluded that the statute must be "sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." In terms of limiting the discretion of the inspector, the Court stated that the statute must be carefully limited in time, place and scope.
Applying these precepts to the case at hand, it is obvious that the oil and gas production facilities subject to the warrantless searches fall under the "pervasively *877 regulated industry" exception to the warrant requirement. It is equally as obvious that the statutory warrantless scheme satisfies the "reasonableness" test enunciated in Burger.
Louisiana no doubt has a substantial interest in improving the health and welfare of its citizens through environmental control regulations. Secondly, the enunciated purpose of the warrantless search scheme is to "assure compliance" with the environmental laws and regulations enacted pursuant to them. La.R.S. 30:2012(A). Further, the scheme satisfies the two basic functions of a warrant. An industrial owner in Louisiana cannot help but know that its facilities will be subject not only to periodic inspections, but also to special inspections, for instance, whenever an exigency exists or environmental violations are suspected at the facility. Further, the statute is limited in terms of time, place and scope. It requires a "reasonable belief" that such exigent conditions exist, and limits the scope of the inspection to those matters reasonably related to the exigent condition.
We thus conclude that the warrantless inspection scheme comports with the constitutional protections against unreasonable searches and seizures, and therefore find this assignment of error to be without merit.[1]

THE PENALTY
Appellant charges that the penalty imposed by the hearing officer is excessive and grossly unfair, relying on the actions taken by it after being notified of the violations. Appellant also claims the penalty is arbitrary and capricious because the hearing officer did not itemize the amounts attributable to the violations at each of the four sites.
The hearing officer reviewed each of the factors listed under La.R.S. 30:2025E.(3)(a) which must be considered in imposing a penalty. The officer concluded:
(i) The history of previous violations or repeated noncompliance.
Response:
Respondent was issued Compliance Orders on July 9, and October 3, 1986, for saltwater discharges at its sites.
(ii) The nature and gravity of the violation.
Response:
The violations were negligent in nature and were of serious gravity. As much as fifty acres of marsh or more have been adversely effected by Respondent's operations.
(iii) The gross revenues generated by Respondent.
Response:
Gross revenues through July 31, 1986 were $1,041,017.56 with a net loss of $418,262.39 claimed.
(iv) The degree of culpability, recalcitrance, defiance, or indifference to regulations or orders.
Response:
Respondent was culpable of the violations and has displayed indifference and defiance of State laws and regulations by failing to correct violations which exist at its facilities despite issuance of two Compliance Orders and two enforcement meetings with departmental staff.
(v) The monetary benefits realized through noncompliance.
Response:
Monetary benefits associated with the violations come from delayed costs and cannot be accurately calculated.
(vi) The degree of risk to human health or property caused by the violations.
Response:
There was no threat to human life, however, as much as fifty acres of wetlands have been adversely impacted.
(vii) Whether the noncompliance and surrounding circumstances were immediately reported to the Department and whether the violation or noncompliance *878 was concealed or there was an attempt to conceal by the person charged.
Response:
The violations were not reported to the Department and when questioned about other facilities during the first enforcement conference, company officials denied that violations existed at other leases which Respondent operated.
(viii) Whether the person charged has failed to mitigate or make a reasonable attempt to mitigate the damages caused by his noncompliance or violation.
Response:
Respondent made minimal effort to mitigate damages and to take remedial action.
Appellant also attacks a number of the hearing officer's findings in imposing the penalty. It contends the hearing officer erred in finding the Compliance Orders had been violated, in finding that its actions were negligent in nature, and in concluding it displayed indifference and defiance of state laws by failing to correct the violations. We do not find the penalty to be excessive. The hearing officer obviously gave the question serious consideration, and the factual conclusions serving as the basis for the imposition of the penalty are supported by the record. We thus find no error in the assessment of the penalty.

CONCLUSION
Appellant's remaining assignments relating to the admission of water samples and evidence of violations uncovered during inspections after the effective date of the sale of the leases by it are clearly without merit. Even were this Court to agree with the propositions advanced, any errors on the hearing officer's part would be harmless beyond any doubt. We thus uphold the rulings below, and the assessment of the penalty against Mullins & Pritchard. Costs of this appeal are taxed to appellant, Mullins & Pritchard.
AFFIRMED.
NOTES
[1] We note that the Louisiana Supreme Court has indicated the exclusionary rule does not even apply in civil proceedings. See Pullin v. Louisiana State Racing Commission, 484 So.2d 105 (La.1986). In Pullin, evidence seized in violation of a licensee's constitutional rights was ruled admissible in a civil proceeding before the licensing commission.