WILKINSON, Circuit Judge,
concurring:
I am pleased to concur in Judge Motz’s fine opinion. The court rightly holds that obtaining historical cell site location information (CSLI) from a third party cell phone provider is not a search under the Fourth Amendment. Any result to the contrary would be at odds with the Supreme Court and decisions from our sister circuits. I write separately to emphasize my concern that requiring probable cause and a warrant in circumstances such as these needlessly supplants the considered efforts of Congress with an ill-considered standard of our own.
Appellants appear to think that the Framers drafted the Constitution with the judiciary alone in mind. I do not deny that the judiciary has an important, indeed critical, role to play in interpreting the Fourth Amendment. But I fear that by effectively rewriting portions of a federal statute under the guise of reasonableness review courts run the risk of boxing the democratic branches out of the constitutional dialogue. For good reason, developing constitutional meaning has always been a collaborative enterprise among the three departments of government. The present case offers a perfect example of why that is so.
I.
In enacting Title II of the Electronic Communications Privacy Act of 1986, popularly known as the Stored Communications Act (SCA), 18 U.S.C. § 2701 et seq., Congress did not behave in a flippant or haphazard fashion. Instead, it crafted a thorough statutory framework limiting the government’s ability to gather wire and electronic communication data from communications service providers (here, Sprint/Nextel). The SCA’s “comprehensive remedial scheme,” Kelley v. Fed. Bureau of Investigation, 67 F.Supp.3d 240, 271 (D.D.C. 2014), “creates a set of Fourth Amendment-like privacy protections by statute, regulating the relationship between government investigators and service providers in possession of users’ private information.” Sams v. Yahoo! Inc., 713 F.3d 1175, 1179 (9th Cir. 2013) (quoting Orin S. Kerr, A User’s Guide to the Stored Communications Act, and a Legislator’s Guide to Amending It, 72 Geo. Wash. L. Rev. 1208,1212 (2004)).
At the heart of the SCA lies § 2703. That provision establishes a calibrated set of procedural safeguards based on the type and amount of information sought and the length of time the records are stored. For instance, “only pursuant to a warrant,” 18 U.S.C. § 2703(a), can the government obtain the contents of a communication that is in electronic storage with a service provider for 180 days or less. Alternatively, the government has a number of options for compelling the disclosure of non-content customer records, or the contents of communications in electronic storage for more than 180 days: “obtainf ] a warrant,” id. §§ 2703(b)(1)(A), (c)(1)(A), “use[] an administrative subpoena ... or trial subpoena,” id. § 2703(b)(l)(B)(i), or “obtain[ ] a court order.” Id. §§ 2703(b)(1)(B)(ii), (c)(1)(B).
*439 Here, the government secured a court order for the disclosure of non-content communication records (specifically, CSLI) pursuant to § 2703(c)(1)(B). Congress set forth the requirements for a valid court order in § 2703(d), which mandates that the government supply “specific and artic-ulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation.” Id. § 2703(d). In other words, § 2703(d) “is essentially a reasonable suspicion standard.” In re U.S. for an Order Pursuant to 18 U.S.C. Section 2703(d), 707 F.3d 283, 287 (4th Cir. 2013).
I see no reason to depart from Congress’s' carefully tailored scheme. As the majority points out, the SCA in fact exceeds the constitutional floor established by the Supreme Court, whose decisions hold that the Fourth Amendment does not apply to information voluntarily conveyed to third parties. Ante at 426-27; see, e.g., Smith v. Maryland, 442 U.S. 735, 743-44, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979); United States v. Miller, 425 U.S. 435, 443, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976). Although appellants would insert their own impressions of the Fourth Amendment into § 2703(d) by way of a warrant and probable cause requirement, that approach not only aspires to overturn Supreme Court rulings but to scuttle the laborious efforts of the Congress to balance privacy and law enforcement interests in a responsible way.
II.
It has long been the case that developing constitutional meaning is not a responsibility that rests solely on the shoulders of the judiciary. It has instead been “a power and duty shared by all three branches', and its shared nature suggests that it ought not be fulfilled by each branch acting independently within its sphere of authority.” Dawn E. Johnsen, Functional Departmen-talism and Nonjudicial Interpretation: Who Determines Constitutional Meaning?, 67 Law & Contemp. Probs. 105,121 (2004). Formulation of constitutional guidance, in other words, is a collaborative enterprise, “with each branch encouraged to recognize its own institutional limitations and to respect the superior competencies of the others.” Id. at 120.*
This principle applies with special force where Congress has weighed in on the Fourth Amendment’s requirement of “reasonableness.” That term, of course, “is not capable of precise definition or mechanical application.” Bell v. Wolfish, 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Faced with a term literally crying out for balance between the competing interests of individual privacy and societal security, it is appropriate to accord some degree of deference to legislation weighing the utility of a particular investigative method against the degree of intrusion on individuals’ privacy interests. See United States v. Jones, - U.S. -, 132 S.Ct. 945, 963- *440 64, 181 L.Ed.2d 911 (2012) (Alito, J., concurring).
In this setting, Congress brings several cards to the table. First, it enjoys a relatively greater degree of access than courts to expert opinion generally and to the expertise of the executive branch in particular. Trial courts, of course, hear expert testimony all the time, but they are to a considerable extent at the mercy of the parties whose witnesses may be called to serve a narrow set of interests rather than the interests of the public at large. Appellate amicus briefs and arguments are helpful to be sure, but not enough, I think, to close the expertise gap or compensate for the large differences in size between congressional and judicial staffs. The more technical the issue (as the one before us surely is), the more salient the expertise differential may prove to be. It is not surprising, then, that “[tjhroughout our history ... it has been Congress that has taken the lead in ... balancing] the need for a new investigatory technique against the undesirable consequences of any intrusion on constitutionally protected interests in privacy.” Dalia v. United States, 441 U.S. 238, 264, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979) (Stevens, J., dissenting). That tradition is a sound one, for it not only reflects an understanding of our own institutional limitations, but the value of having democratic backing behind Fourth Amendment balancing.
Second, Congress is often better positioned to achieve legal consistency. Abandoning Congress’s comprehensive effort for particularized and improvised judicial standards invites confusion into what has been a relatively stable area of the law. See ante at 426-28. The SCA — which remains “the primary vehicle by which to address violations of privacy interests in the communication field,” Adams v. City of Battle Creek, 250 F.3d 980, 986 (6th Cir. 2001) — promotes uniformity by focusing the courts’ inquiry on a prescribed set of conditions that must be satisfied before disclosure will be compelled. See, e.g., 18 U.S.C. § 2703(d). Detailed statutory standards have at least as fair a chance of achieving clear guidance and consistency as court developed rules. Congress’s aim of consistency would be imperiled, however, if courts become willing to strike this or that portion of the statute to accommodate what may be their unique privacy policy views. In my judgment, uniform national standards rather than regional variations among the courts has merit where Congress has comprehensively legislated in a particular field.
Finally, Congress imparts the considerable power of democratic legitimacy to a high stakes and highly controversial area. The emergence of advanced communication technologies has set off a race between criminal enterprises on the one hand and law enforcement efforts on the other. Modern communication devices- — • even as they abet the government’s indigenous tendencies to intrude upon our privacy — also assist criminal syndicates and terrorist cells in inflicting large-scale damage upon civilian populations. Appellants’ strict standard of probable cause and a warrant even for non-content information held by third parties thus risks an imbalance of the most dangerous sort, for it allows criminals to utilize the latest in technological development to commit crime and hamstrings the ability of law enforcement to capitalize upon those same developments to prevent crime. The fact that the appellants in this case were convicted of Hobbs Act violations and brandishing offenses cannot obscure the implications of their proposed standards for much more serious threats down the road.
In my view, striking a balance in an area rife with the potential for mass casualty *441 cannot leave democracy out in the cold. Courts must continue to play a vital role in Fourth Amendment interpretation, but in large matters of life and death the people’s representatives must also play their part. See, e.g., Donovan v. Dewey, 452 U.S. 594, 603, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981) (Congress’s authorization of warrantless inspections of surface and underground mines deemed constitutional under the Fourth Amendment in light of the “notorious history of serious accidents” causing large loss of life in the mining industry). It is naive, I think, for the judicial branch to assume insensitivity to privacy concerns on the part of our elected brethren. Just last year, for example, a bipartisan Congress terminated the National Security Agency’s collection of bulk phone records. Uniting and Strengthening America by Fulfilling Rights and Ensuring Effective Discipline Over Monitoring Act of 2015 (USA Freedom Act), Pub. L. No. 114-23, 129 Stat. 268. Other statutes make Congress’s privacy concerns abundantly clear. See, e.g., Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896 (codified at 5 U.S.C. § 552a (2012)); Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197 (codified as amended at 18 U.S.C. § 2510 et seq. (2012)).
It is human nature, I recognize, to want it all. But a world of total privacy and perfect security no longer exists, if indeed it ever did. We face a future of hard tradeoffs and compromises, as life and privacy come simultaneously under siege. How sad, near the very inception of this journey, for appellants to adopt the most stringent of Fourth Amendment standards, to discard the great values of democratic compromise, and to displace altogether the legislative role.

 My dissenting friend rightly lauds the function of judicial review, see Marbury v. Madison, 5 U.S. 137, 178, 1 Cranch 137, 2 L.Ed. 60 (1803), but effectively dismisses respect for Congress’s efforts as one component of that review. See post at 449 n. 14. This, of course, envisions a process where the judiciary speaks only to itself, a curiously monologic exercise at odds with the constitutional structure of American government.
Not to worry, says the dissent. All it is doing is "eliminating a single line of statutory text, specifically 18 U.S.C. § 2703(c)(1)(B).” Id, But "eliminating” a critical option Congress has provided in favor of the dissent’s idea of what is best for us is the kind of constitutional club that ends the conversation and severely limits opportunities for legislative reforms and responses in what is a rapidly evolving field.