**Ray MARSHALL, Secretary of Labor, United States Department of Labor**

**v.**

**STOUDT'S FERRY PREPARATION COMPANY, Appellant.**

No. 78–2364.

United States Court of Appeals, Third Circuit.

Argued June 6, 1979.

Decided July 19, 1979.

**590**

Donald Brobst (argued), Rosenn, Jenkins & Greenwald, Wilkes-Barre, Pa., for appellant.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., Peter F. Vaira, Jr., U. S. Atty., Philadelphia, Pa., William Kanter, Douglas N. Letter (argued), Appellate Staff, Civil Division, Dept. of Justice, Washington, D. C., Carin Ann Clauss, Sol., Morell E. Mullins, Associate Sol., Thomas Mascolino, Counsel, Alan Yamamoto, Ronald E. Meisburg, Dept. of Labor, Washington, D. C., for appellee.

Before WEIS and GARTH, Circuit Judges, and GERRY, District Judge.*

## OPINION OF THE COURT

WEIS, Circuit Judge.

In this appeal we determine that the word "mine" as used in the Mine Safety and Health Amendments Act of 1977 includes appellant's preparation plant, which separates a low-grade fuel from sand and gravel dredged from a riverbed. We also find the warrantless inspection provisions of the Act sufficiently distinguishable from those of the Occupational Health and Safety Act so as to withstand constitutional challenge. We therefore affirm an order of the district court permitting the Secretary of Labor to inspect the appellant's facility without a warrant.

The Commonwealth of Pennsylvania dredges the Schuylkill River and deposits the material obtained from the riverbed into a nearby basin. Stoudt's Ferry Preparation Company purchases this material and by the use of a front-end loader and a conveyor belt transports the dredged refuse to its plant. There, through a sink and float process, the material is separated into two piles, one of sand and gravel, the other of a burnable material which, when blended with other substances, is usable fuel. The plant is fully automated and employs four people.

The company sells the sand and gravel as well as the burnable material. In 1977, of approximately 500,000 tons of dredging material processed, 64,500 tons were burnable, and of the 250,000 tons dredged in 1978, about 10,700 were in that category. The BTU output of the burnable material is far lower than that of anthracite or bituminous coal or lignite, and the market price is about one-third of anthracite. Because it is extracted by a specific gravity process, the content of the material is uncontrollable. After making a chemical analysis of the burnable substance, a utility company that had negotiated an output agreement with Stoudt's Ferry drew up a sales contract in which the product is described as "usable anthracite refuse."

In May 1978, an inspector from the Department of Labor attempted to inspect the plant under the Mine Safety and Health Amendments Act of 1977, 30 U.S.C.A. §§ 801–878 (1971 & Supp. 1979), but was denied entry.[1] The Secretary of Labor then

---

* Honorable John F. Gerry, United States District Judge for the District of New Jersey, sitting by designation.

1. Section 201 of the Act, 30 U.S.C.A. § 813, providing for inspections, reads in relevant part:

"(a) Authorized representatives of the Secretary [of Labor] . . . shall make frequent inspections and investigations in coal or other mines each year for the purpose of (1) obtaining, utilizing, and disseminating information relating to health and safety conditions, the causes of accidents, and the causes of diseases and physical impairments originating in such mines, (2) gathering information with respect to mandatory health or safety standards, (3) determining whether an

sought a preliminary injunction enjoining Stoudt's Ferry from refusing to permit the inspection.[2] After a hearing, the district court found that the company's operation came within the scope of § 102(b) of the Act, 30 U.S.C.A. § 802(h)(1), the section defining the word "mine," and that the warrantless entry provisions of the statute were constitutional. Concluding that the congressional purpose behind the Act is to give the Secretary broad authority in the mining and extraction industries, the district court found that the product sold by the company to the utility was "akin to bituminous coal, lignite or anthracite . . . [a]nd what is taking place . . . is the work of preparing coal or other minerals." As an additional basis for coverage, the district court concluded that the operation involved the extraction of sand and gravel from their natural deposits. The court, therefore, granted the Secretary's request for an injunction, but at the urging of the company, imposed a confidentiality requirement and granted a stay pending appeal.

### I.

Congress passed the Federal Mine Safety and Health Amendments Act of 1977 to strengthen the legislation governing coal, metallic, and nonmetallic mines already in effect, the Federal Metallic and Nonmetallic Mine Safety Act, Pub.L.No.89–577, 80 Stat. 772, and the Federal Coal Mine Health and Safety Act of 1969, Pub.L.No. 91–173, 83 Stat. 742. The Coal Act was the more comprehensive, covering miners' health as well as safety, to which the Metal Act was limited. The standards in the Coal Act were more definitive and complex and enforcement was more thorough.[3] But Congress was not satisfied that all that could be done had been done to promote health and safety in the mines. Among the improvements suggested was the adoption of one statute covering the entire mining industry and containing strengthened enforcement provisions to be administered by the Department of Labor. To meet its objectives, Congress included a broad definition of "mine" in § 102(b) of the Act, reading in relevant part:

"(1) '[C]oal or other mine' means (A) an area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground, (B) private ways and roads appurtenant to such area, and (C) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, facilities, equipment, machines, tools, or other property including impoundments, retention dams, and tailings ponds, on the surface or under-

imminent danger exists, and (4) determining whether there is compliance with the mandatory health or safety standards, or with any citation, order, or decision issued under this subchapter or other requirements of this chapter. In carrying out the requirements of this subsection, no advance notice of an inspection shall be provided to any person . . . .. In carrying out the requirements of clauses (3) and (4) of this subsection, the Secretary shall make inspections of each underground coal or other mine in its entirety at least four times a year, and of each surface coal or other mine in its entirety at least two times a year. . . . For the purpose of making any inspection or investigation under this chapter, the Secretary . . . shall have a right of entry to, upon, or through any coal or other mine."

**2.** 30 U.S.C.A. § 818 provides that

"(a)(1) [t]he Secretary may institute a civil action for relief, including a permanent or temporary injunction, restraining order, or any other appropriate order in the district court of the United States . . . whenever [the] operator or his agent—

.    .    .    .

(C) refuses to admit [an authorized] representative for the coal or other mine, [or]

(D) refuses to permit the inspection of the coal or other mine, or the investigation of an accident or occupational disease occurring in, or connected with, such mine . . . ."

**3.** See the introductory and background remarks of the Senate Resources Committee in the report accompanying S. 717, the legislative proposal which, as modified, became the Federal Mine Safety and Health Amendments Act of 1977, S.Rep.No.181, 95th Cong., 1st Sess. 1–6, *reprinted in* [1977] U.S.Code Cong. & Admin. News, pp. 3401, 3401–06.

ground, used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits in nonliquid form, or if in liquid form, with workers underground, or used in, or to be used in, the milling of such minerals, or the work of preparing coal or other minerals, and includes custom coal preparation facilities. . . .

"(2) For purposes of subchapters II, III, and IV of this chapter, 'coal mine' means an area of land and all structures, facilities, machinery, tools, equipment, shafts, slopes, tunnels, excavations, and other property, real or personal, placed upon, under, or above the surface of such land by any person, used in, or to be used in, or resulting from, the work of extracting in such area bituminous coal, lignite, or anthracite from its natural deposits in the earth by any means or method, and the work of preparing the coal so extracted, and includes custom coal preparation facilities;

"(i) 'work of preparing the coal' means the breaking, crushing, sizing, cleaning, washing, drying, mixing, storing, and loading of bituminous coal, lignite, or anthracite, and such other work of preparing such coal as is usually done by the operator of the coal mine . . . ." 30 U.S.C.A. § 802(h).

Commenting on this sweeping definition, the Senate Committee stated that "what is considered to be a mine and to be regulated under this Act" was to be given the broadest possible interpretation and that doubts were to be resolved in favor of inclusion of a facility within the coverage of the Act. See S.Rep.No.181, 95th Cong., 1st Sess. 1, 14, reprinted in [1977] U.S.Code Cong. & Admin. News, pp. 3401, 3414.

Despite the statute's expansive language and this expression of legislative intent,

Stoudt's Ferry contends that it is not included within the Act's ambit because the facility's activities are not related to the extraction of minerals from natural deposits or their preparation after extraction. But the company's process of separating from the dredged refuse a burnable product "akin" to coal, which is then sold as a low-grade fuel, brings the company within the Act's coverage as the operator of a "structure" and a "facility" "on the surface . . . used in . . . the work of preparing coal or other minerals." 30 U.S.C.A. § 802(h). We agree with the district court that the work of preparing coal or other minerals is included within the Act whether or not extraction is also being performed by the operator. Although it may seem incongruous to apply the label "mine" to the kind of plant operated by Stoudt's Ferry, the statute makes clear that the concept that was to be conveyed by the word is much more encompassing than the usual meaning attributed to it—the word means what the statute says it means.[4]

Moreover, the record also establishes that the company processes and sells the sand and gravel it separates from the material dredged from the river. We are persuaded, as was the district judge, that in these circumstances, the sand and gravel operation of the company also subjects it to the jurisdiction of the Act as a mineral preparation facility.

## II.

◼ Relying on the Supreme Court's decision in *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), the company further contends that an agent of the Secretary of Labor is required to obtain a search warrant before he is entitled to enter and inspect the premises. The company argues that the warrantless inspection

---

4. That the law should attribute expansive and sometimes even bizarre meanings to a word is not a novel phenomenon. At common law under Pennsylvania's ancient integrated plant doctrine, chattels forming part of an operating industrial plant became fixtures and thus part of the realty. *Voorhis v. Freeman,* 2 Watts & Serg. 116, 37 Am.Dec. 490 (1841). In *Titus v.*

*Poland Coal Co.,* 275 Pa. 431, 119 A. 540 (1923) and *Hillard Live-Stock Co. v. Amity Coal Co.,* 2 Lancaster L.Rev. 241 (1885), cars used to move coal within a mine were treated as realty, leading to whimsical speculations that mules which pulled the cars might also be considered real estate.

statutory section violates the fourteenth amendment and that there were no reasonable grounds to justify the issuance of a warrant, had one been sought. The issue is clearly drawn: whether *Barlow's* renders unconstitutional the Mine Safety Act's inspection provision. As the Court's opinions in that case indicate, however, the answer is not immediately apparent.

In *Barlow's,* § 8(a) of the Occupational Safety and Health Act of 1970 (OSHA), 29 U.S.C. § 657(a), authorizing the Secretary of Labor to search the work area of an employment facility without a warrant, was held unconstitutional. Starting from the premise that warrantless searches of both home and commercial properties are generally unreasonable, the Court said that only if it comes within a carefully defined exception may a statute validly authorize a search without a warrant. As recognized exceptions the Court cited that of pervasively regulated businesses, typified by *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (firearms), and those closely regulated enterprises having a long history of governmental inspection and supervision, *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) (liquor), where businessmen would have no reasonable expectation of privacy. Aware in advance of the burdens of their trade, by choosing to accept the benefits these proprietors in effect consent to the restrictions. 436 U.S. at 413, 98 S.Ct. 1816. Otherwise, the reasonableness of a warrantless administrative search will depend upon the specific enforcement needs and privacy guarantees of the particular statute under review.

The Occupational Safety and Health Act covers a wide variety of enterprises affecting commerce, from the very small and simple to the large and most complex. Section 657(a) authorized the Secretary to enter any establishment or area where work was being performed by an employee and inspect all devices, apparatus, and materials. In addition, by regulation the Secretary had expanded the scope of any search to include records related to the purpose of the inspection. 29 C.F.R. § 1903.3 (1978). The inspection provisions of the Mine Safety Act, by contrast, are more limited and more closely defined. Moreover, coal mining has a history of governmental regulation, first by the states, and later by the federal government. A bill was introduced as early as 1865 to create a federal mining agency, although it was not until 1910 that the Bureau of Mines was established. In 1939, an effort to extend inspection authority to the Bureau was unsuccessful, but such legislation did pass in 1941.

The Coal Mine Health and Safety Act of 1969 contained provisions for warrantless searches essentially the same as those included in the Amendments Act of 1977. In 1973, a three-judge court concluded that the coal mining industry, like firearms and liquor, had long been pervasively regulated and that warrantless searches were reasonable in the context of mine safety investigations. *Youghiogheny & Ohio Coal Co. v. Morton,* 364 F.Supp. 45, 49 & n. 3 (S.D.Ohio 1973). In reporting on the 1977 amendments, the Senate Committee noted its approval of the *Youghiogheny* case, thus indicating that the opinion reflected congressional intention with respect to the current inspection provisions. The Committee commented that it felt advance notice of inspections would undercut the Act's objectives because of the ease with which safety or health hazards could be concealed. S.Rep. No.181, 95th Cong., 1st Sess. 1, 27, *reprinted in* [1977] U.S.Code Cong. & Admin. News, pp. 3401, 3427. *Youghiogheny* predated *Barlow's,* but we believe its reasoning essentially is still valid.[5]

Mindful of the Supreme Court's reluctance to foreclose the incremental protection afforded a proprietor's privacy by a warrant, we are persuaded that the Mine Safety Act's enforcement scheme justifies warrantless inspections and its restrictions

---

5. *See also* Comment, When are Administrative Inspections Warranted? 50 U.Colo.L.Rev. 231 (1979) [hereinafter Comment, Administrative Inspections]; Comment, The Constitutionality of Warrantless OSHA Inspections, 22 Vill. L.Rev. 1214 (1977).

on search discretion satisfy the reasonableness standard reasserted in *Barlow's*. Although the Mine Safety Act's coverage of enterprises has been broadened from that of the predecessor Coal Mine Safety Act to include other than coal mining, the statute is still much more limited than OSHA and is aimed at an industry with an acknowledged history of serious accidents. Moreover, unlike OSHA, the Mine Safety Act mandates periodic inspections and is specific in that no advance warning is to be given when the inspection is to determine whether an imminent danger exists or whether there is compliance with mandatory health and safety standards or with any citations, orders, or decisions outstanding, 30 U.S.C.A. § 813(a). If the inspection is for obtaining or disseminating information about health and safety conditions, causes of accidents, or gathering of information about mandatory health and safety standards, the Secretary may give advance notice. *Id.*

It may be seen that the Mine Safety inspection provision places limitations upon the purposes for which searches may be made, limits those in which no advance notice is given, and is more narrowly drawn than the comparable OSHA section. There is consequently less likelihood of the abuses of "unbridled discretion of executive and administrative officers" which *Barlow's* found objectionable. 436 U.S. at 323, 98 S.Ct. at 1825. Though *Barlow's* was not impressed with the importance of surprise inspections in the OSHA setting, we are not prepared to say that the legislative judgment as to their necessity in the context of mine safety is misplaced.

Another significant difference between the statutes is that the Mine Safety Act provides for immediate judicial review by requiring the Secretary to secure an injunction in the district court if he is refused entry. 30 U.S.C.A. § 818. Any unusual privacy expectations may be fully explored in that proceeding and a reasonable accommodation may be achieved. In this case, for example, the court imposed a confiden-tiality requirement upon the inspectors to protect the appellant's trade secrets.

Although the *Barlow's* dissent voiced the fear that the majority's decision endangered the inspection provisions in the Coal Mine Health and Safety Act, 436 U.S. at 339 n. 11, 98 S.Ct. 1816 (Stevens, J., dissenting), we believe that there are enough major differences between *Barlow's* and the case at bar to lead to a contrary result.[6] In our view, warrantless inspections and the procedure provided for enforcement in the Mine Safety Act meet the standards of reasonableness in this pervasively regulated industry. Accordingly, the judgment of the district court will be affirmed.

---

6. *See* Comment, Administrative Inspections, *supra* at 241–46; 14 N.Eng.L.Rev. 119, 127 & n. 70 (1978).