UNITED STATES of America,
Plaintiff-Appellant,

v.

BLUE DIAMOND COAL COMPANY,
Scotia Coal Company,
Defendants-Appellees.

No. 80–5084.

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 17, 1980.

Decided Dec. 17, 1981.

Rehearing and Rehearing En Banc
Denied Feb. 8, 1982.

**512**

Patrick H. Molloy, U. S. Atty., Lexington, Ky., William C. Bryson, Washington, D.C., for plaintiff-appellant.

William E. Scent, Robert Cusick, Tarrant, Combs & Bullitt, Louisville, Ky., for defendants-appellees.

Before ENGEL and KEITH, Circuit Judges and WISEMAN,* District Judge.

ENGEL, Circuit Judge.

In this appeal we are required to consider whether the Fourth Amendment protection against unreasonable searches and seizures extends to the warrantless seizure of statutorily required records from the office of a coal mine company where they were located on a table and open to inspection.

We reverse the district court judgment suppressing the records and directing their return to the coal mine operator.[1] In so doing, we recognize that the mine industry is a highly regulated one and that a businessman in such an industry, in accepting the burdens as well as the benefits of the trade, is said to consent to restrictions placed upon him. *Marshall v. Barlow's*, 436 U.S. 307, 313, 98 S.Ct. 1816, 1820–21, 56 L.Ed.2d 305 (1978); *Almeida-Sanchez v. United States*, 413 U.S. 266, 271, 93 S.Ct. 2535, 2538, 37 L.Ed.2d 596 (1973). Although the coal mine operator has an interest in the retention of the records, we find that it does not rise to a Fourth Amendment interest which requires their suppression.

I.

Shortly before noon on March 9, 1976, an underground explosion occurred within the Imboden seam of the Scotia Coal Mine, located in Letcher County, Kentucky. Officials of the Mine Enforcement and Safety Administration[2] (MESA) began to arrive at the mine premises in the early afternoon to coordinate the rescue efforts for fifteen coal miners who were trapped underground. The Scotia Mine was owned and operated by appellee Scotia Coal Company and by its parent company, appellee Blue Diamond Coal Company.

At approximately 3:00 P.M. that afternoon, Bill Clemons, an assistant district manager for MESA, arrived at the mine and assumed control of the rescue and recovery operations. Approximately 9:00

---

* Hon. Thomas A. Wiseman, Judge, United States District Court for the Middle District of Tennessee, sitting by designation.

1. The government has authority to appeal a suppression order if the defendant has not been put in jeopardy and the U. S. Attorney certifies the appeal is not taken for purposes of delay and the evidence provides substantial proof of a material fact. 18 U.S.C. § 3731.

2. The accident occurred when the Coal Mine Health and Safety Act of 1969, 30 U.S.C. § 801 *et seq.*, was in force. The new act, the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 801 *et seq.* (Supp. I 1977) [hereafter 1977 Act], shifted responsibility from the Interior Department to the Department of Labor. The current name of the regulatory agency has been changed to Mine Safety and Health Administration (MSHA). We refer to provisions of the 1969 Act in force at the time of the accident except where noted otherwise.

P.M., while the coal miners were still trapped underground, Clemons ordered a subordinate to confiscate records which the mining company was required to maintain under the Coal Mine Health and Safety Act of 1969, 30 U.S.C. § 863. Among the records required to be kept under the Act were tests for the methane content of the air at underground locations within the coal mines. A belief that methane concentration, a frequent cause of ignition within coal mines,[3] had not been properly monitored, was given by Clemons as his reason for ordering the seizure of the records:

Q Now, do you recall giving any instructions to anyone about any Fire Boss books of the company?

A Sometime on the night of March 9th, I think—can't remember exactly—it was around 9:00 o'clock, I told someone to confiscate the Fire Boss books.

Q Why did you tell someone to do that?

A By that time it was fairly well apparent to me that there was a good possibility of the disaster from the explosion and it was my feeling that there would be an extensive investigation and the Fire Boss books would be of value in the investigation.

Q What were the Fire Boss books or what are Fire Boss books.

A Fire Boss books is a book in which records of the examinations of the mine are kept. These examinations are required to be made before we get into a mine.

Q Why did you think they might be of some help in an investigation?

A In my mind at that time from the extent of the explosion and from where the—I was told by someone that the end of the track was, it was quite apparent there had been a large accumulation of methane on that section and if the section had been firebossed, I could not understand how that large a volume of methane could have accumulated since the time it should have been firebossed.

Q Whose duty is it, if anyone's duty, to keep and maintain the Fire Boss Books?

A It's the company's responsibility to maintain the Fire Boss books.

\* \* \* \* \* \*

Q If it was a duty of the company to maintain the books and keep the books, why did you ask someone to take custody of the books?

A To be sure that we had them available to look at and study and be sure none were misplaced or anything.

\* \* \* \* \* \*

Although Clemons could not remember to whom he gave the particular instruction, Herman Lucas, a coal mine inspector for

3. The legislative history of the 1969 Act reflects congressional concern for the danger of explosions resulting from ignition of undetected accumulation of methane in coal mines:

The most hazardous condition that can exist in a coal mine, and lead to disaster-type accidents, is the accumulation of methane gas in explosive amounts. Methane can be ignited with relatively little energy and there are, even under the best mining conditions, numerous potential ignition sources always present.... Men working in the face areas where coal is mined and where fresh methane can be emitted in large volumes due to the disturbance of the coal bed, are required to take numerous safety precautions to insure that methane is not present in explosive amounts. All equipment in by the last open crosscut must be of a permissible type, and frequent examinations, both preshift and onshift, are made to determine methane con-

centrations. The present bill requires examinations for methane onshift at least once each coal producing shift, at the start of each coal producing shift before electrical equipment is energized, at least every 20 minutes during a shift when electrically operated equipment is energized, before intentional roof falls are made, before explosives are fired, and before welding is done. When, on examination, methane concentrations exceed 1 volume per centum, changes must be made in the ventilation to reduce the methane content. When the methane concentration exceeds 1.5 volume per centum, the electricity must be shut off in the section affected, and men withdrawn from the section until the methane content is reduced.

H.R.Rep.No.91–563, 91st Cong., 1st Sess. 21, *reprinted* in [1969] U.S.Code Cong. & Admin. News 2503, 2524.

MESA, testified that he received the order and carried it out.

Lucas understood that the instruction included not only the Fire Boss book, but extended to the pre-shift books, on-shift books and electrical examination books. All of these books contained entries recording the result of inspections made by mine employees; all were required by the Coal Mine Health and Safety Act of 1969.[4]

In carrying out Clemons' order, Lucas seized and removed a total of 20 books from the mine office and electrical shop on the mine premises. These included six pre-shift and on-shift books, the "bore hole" and "new return" books, the Fire Boss book, the two weekly books and electrical examination books from nine areas of the mine.

Lucas first proceeded to the mine office where all the books, except for the electrical records, were kept. The mine offices were located approximately 100 yards from the mine which contained the Imboden Seam, the site of the accident. Jasper K. Cornett, Vice President of Operations for Blue Diamond and Scotia, testified concerning the location of the records within the office:

Q Where were the books in active use, that were in the process of being filled; where were they actually kept?

A Well, for the most part, there was a table in the Mine Office like a conference table that the various foremen came, either when they were preparing to go on the shift or when they came off, they sat down and made out their various records, their time sheets, their inspection reports, these things. They sat around this table and made out—filled out their books and they left them lying there on that table. They were available for the other people that came in or out.

Q Did a MESA inspector regularly make use of these books and examine them?

A Yes; whatever occasion they were there for, they also included examination of the books as part of their inspection of the mine.

Q Was there any restriction made upon them when they could look at the books?

A No, sir; they were available at all times.

A second shift mine foreman, Bruce Jones, testified that he was present when Lucas entered the office between 5:00 and 6:00 P.M. that afternoon. Jones stated that "quite a few" people were in the office at that time. Upon leaving, Lucas inquired where the electrical records were kept. He then went to the electrical shop and was provided the records maintained at that location after making a demand for them. Finally, he asked David Adams, a maintenance foreman, if he desired a receipt for the records, including those taken from the mine office.

It is undisputed that after the records were seized, no MESA official examined them or intended to do so at any time during the rescue operation, which lasted until March 11. Although Clemons denies giving any such order, the books were locked in a government vehicle by Robert Fleming, a coal mine inspector, during the late evening or early morning of March 9 or 10. Fleming turned the books over to MESA's Whitesburg, Kentucky office on March 11. The record shows that the coal company repeatedly asked for the records to be returned, but did not receive an inventory until several weeks later.

## II.

On June 25, 1979, a grand jury in the United States District Court for the East-

---

**4.** There is a pre-shift and an on-shift book for each working section of the mine containing information about hazardous conditions, including methane concentration, 30 U.S.C. § 863(d)(1). Similar records are kept for the "bore hole," an area where rock loading takes place and for "new returns," an area in which the coal is not currently being mined. In addition, there are two books which cover the entire mine area. One book reports on examination of emergency escapeways and the other reports the result of weekly examinations for hazardous methane conditions. Electrical records are also kept for each section of the mine.

ern District of Kentucky returned an indictment charging the appellee mine companies with four counts of willfully violating a mandatory safety standard in the operation of a coal mine, in violation of 30 U.S.C. §§ 819, 863 and 877. The mine companies were also charged with two counts of making false statements in records required to be maintained by the mine operator, in violation of 30 U.S.C. § 819.

In advance of the trial, the defendants moved to suppress the records which had been seized by the federal mine inspection officials from the mine premises. Following an evidentiary hearing, the district court granted the motion and in a memorandum opinion held that the seizure of the records violated the defendants' rights under the Search and Seizure Clause of the Fourth Amendment. In suppressing the evidence and ordering its return to the coal companies, the district judge held that there was not, in the first instance, any "search" within the meaning of that term under the Constitution since "there is no evidence suggesting any general exploration or rummaging through other papers or belongings. *Coolidge v. New Hampshire,* 403 U.S. 443, 467, 91 S.Ct. 2022, 2038–39, 29 L.Ed.2d 564 (1971). To have a search within the meaning of the Fourth Amendment, it is necessary to have a factual predicate which reveals a looking, an exploration or quest for that which is not in plain view." (Citations omitted).

Nevertheless the district judge held that "[w]hat did occur within the consideration of the Fourth Amendment at the Scotia mine buildings was a seizure. The federal agent had no warrant." Although recognizing that the defendants were engaged in a closely and pervasively regulated industry, the trial court held that [t]he mere fact of a lessened expectation of privacy does not vacate the protection of the Fourth Amendment against unreasonable seizure," relying upon our circuit's decision in *United States v. Consolidation Coal Co.,* 560 F.2d 214, 217 (6th Cir. 1977), *vacated and remanded* 436 U.S. 942, 98 S.Ct. 2841, 56 L.Ed.2d 783 (1978), *judgment reinstated* 579 F.2d 1011 (6th Cir. 1978), *cert. denied,* 439 U.S. 1069, 99 S.Ct. 836, 59 L.Ed.2d 34 (1979):

> Even where a statute requires records to be maintained and authorizes on-premises inspection of them in the normal course no precedent sanctions direct access to the records without demand in the absence of a search warrant.

The trial court also expressly held upon the facts before it that there had been no consent by mine company officials to the seizure of the records, and that notwithstanding the presence of emergency conditions related to the rescue of the missing miners, "the seizure of the records here was 'detached' from the exigent circumstance of the rescue crisis for, in fact, the seizure had no bearing on the rescue operations." Under such circumstances, therefore, "the government has failed to establish by evidence any viable ground for not adhering to the established procedures for securing the documents it deemed important; in this instance it is the procedural defect which dictates the conclusion that the seizure of the Scotia records was impermissible."

### III.

#### A.

The coal mining industry is subject to pervasive regulation by federal statute. The congressionally expressed purpose of the Coal Mine Health and Safety Act of 1969 is the protection of the health and safety of the coal miner as well as the improvement of working conditions and practices in the coal mines. 30 U.S.C. § 801.

To effectuate these purposes, Congress has promulgated numerous health and safety standards within the Act. An essential part of the legislation provides for routine examination and testing of conditions within the coal mines by the miners themselves to monitor compliance with the health and safety standards and to discover any other hazardous conditions. The results of these examinations must be recorded in books approved by the Secretary. These record

books, with the sole exception of the electrical inspection reports, are to be maintained "in an area on the surface of the mine chosen by the mine operator to minimize the danger of destruction by fire or other hazard, and the record shall be open for inspection by interested persons." 30 U.S.C. § 863(d)(1), (f), (g), (w). The electrical reports are required to be maintained for inspection by mine employees and the MESA representative. 30 U.S.C. § 865(g).

Congress has also provided for inspections and investigations of coal mines by the Secretary or its representative (MESA). These inspections and investigations may be for any of four purposes:

(1) obtaining, utilizing, and disseminating information relating to health and safety conditions, the causes of accidents and the causes of diseases and physical impairments originating in such mines,

(2) gathering information with respect to mandatory health or safety standards,

(3) determining whether an imminent danger exists, or

(4) determining whether or not there is compliance with the mandatory health or safety standards or with any notice, order, or decision issued under this subchapter.

30 U.S.C. § 813(a).

Notice to the coal mine operator is not allowed for inspections coming within the third or fourth clause of this section.[5] The

government is given a "right of entry to, upon, or through any coal mine" to make any such inspection or investigation. 30 U.S.C. § 813(b)(1). This has been interpreted as creating an exception to the warrant requirement of the Fourth Amendment.[6]

The Act also contains procedures applicable to accidents. Thus, when a mining accident occurs, the operator is required to take measures to prevent the destruction of evidence which would assist in investigating its causes. 30 U.S.C. § 813(e). For its part, the government is entitled to take any action necessary to protect lives and is given a discretionary right to direct rescue and recovery operations. 30 U.S.C. § 813(e). The operator must investigate the cause of an accident and make records of such investigation open for inspection by interested persons. 30 U.S.C. § 821(a). The government may subpoena witnesses and relevant papers, books, and documents for the purpose of holding a public hearing to make an investigation of the accident. 30 U.S.C. § 813(d).

Finally, the Act gives the government the power to obtain a permanent or temporary injunction, restraining order, or other appropriate order from a United States District Court if the operator fails to cooperate with the Secretary or its representative. Examples of such conduct are failure to admit representatives to the mine, refusal to permit inspection, or refusal to permit access to or the copying of records. 30 U.S.C. § 818(c), (d), (f).

---

5. Congress, in the legislative history to the 1977 Act, maintained the same structure concerning notice for inspections and investigations:

Indeed, in view of the notorious ease with which many safety or health hazards may be concealed if advance warning of inspection is obtained, a warrant requirement would seriously undercut this Act's objectives.

The Committee has specifically adopted the prohibition on advance notice of inspections which is currently the rule under the Coal Act ...

S.Rep. 95–181, 95th Cong., 1st Sess. 27, *reprinted* in [1977] U.S.Code Cong. & Admin.News, 3401, 3427. The 1977 Act specifically provides that notice is optional for inspections coming within the terms of clause 1 and 2 of the 1969 Act. 30 U.S.C. § 813 [1977 Act].

6. Although the right of entry set forth in 30 U.S.C. § 813(b)(1) makes no mention of the need for a warrant, the provision has consistently been interpreted as creating an exception to the Fourth Amendment warrant requirement. The legislative history to the 1977 Act specifically states there is no need for a warrant and approves the decision of a three-judge panel in *Youghiogheny and Ohio Coal Co. v. Morton*, 364 F.Supp. 45 (S.D.Ohio 1973), holding the provision of the 1969 Act constitutional. S.Rep.No.95–181, *supra*. The Supreme Court recently noted that Section 103(a) of the 1977 Act, 30 U.S.C. § 813(a), authorizes "a general program of warrantless inspections." *Donovan v. Dewey*, 452 U.S. 594, 101 S.Ct. 2534, 2541, 69 L.Ed.2d 262 (1981).

### B.

Courts have consistently upheld the constitutionality of the warrantless provision of the mining acts although the Supreme Court has held that such exceptions are limited to "relatively unique circumstances" involving industries with a history of close government regulation.[7] *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313, 98 S.Ct. 1816, 1821, 56 L.Ed.2d 596 (1978). The Supreme Court has recently held that the general program of warrantless inspections authorized by Section 103(a) of the 1977 Act, 30 U.S.C. § 813(a), does not violate the Fourth Amendment.[8] *Donovan v. Dewey*, 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981). In *Donovan*, the Supreme Court noted:

> [Our past] decisions make clear that a warrant may not be constitutionally required when Congress has reasonably determined that warrantless searches are necessary to further a regulatory scheme and the federal regulatory presence is sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes.

101 S.Ct. at 2539. Applying these principles, the Court found first that Congress reasonably determined that warrantless searches are necessary to further the substantial federal interest in mine safety:

> [I]t is undisputed that there is a substantial federal interest in improving the health and safety conditions in the Nation's underground and surface mines. In enacting the statute, Congress was plainly aware that the mining industry is among the most hazardous in the country and that the poor health and safety record of this industry has significant deleterious effects on interstate commerce. Nor is it seriously contested that Congress in this case could reasonably determine ... that a system of warrantless

inspections was necessary "if the law is to be properly enforced and inspection made effective." *United States v. Biswell*, 406 U.S., [311] at 316, 92 S.Ct. [1593] at 1596 [32 L.Ed.2d 87]. In designing an inspection program, Congress expressly recognized that a warrant requirement could significantly frustrate effective enforcement of the Act.

*Id.* at 2539–40. Next the Court reviewed the inspection provisions of the Act and held that "the regulation of mines it imposes is sufficiently pervasive and defined that the owner of a [mining facility] cannot help but be aware that he 'will be subject to effective inspection.'" *Id.* at 2540. Finally, the Court noted:

> [T]he Act provides a specific mechanism for accommodating any special privacy concern that a specific mine operator might have. The Act prohibits forcible entries, and instead requires the Secretary, when refused entry onto a mining facility, to file a civil action in federal court to obtain an injunction against future refusals. 30 U.S.C. § 818(a) (1976 ed., Supp. III). This proceeding provides an adequate forum for the mine owner to show that a specific search is outside the federal regulatory authority, or to seek from the District Court an order accommodating any unusual privacy interests that the mine owner might have.
>
> Under these circumstances, it is difficult to see what additional protection a warrant requirement would provide.

*Id.* at 2541 (citations omitted).

### IV.

■ The district court ruled there was no search within the meaning of the Fourth Amendment because inspector Lucas did not rummage once he was within the mine office. The entry into the office, however, is itself a search for purposes of the Fourth

---

7. The Supreme Court approvingly noted the provisions of the mine act which envision resort to a federal court when entry is refused by a mine operator. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 321–22 n.18, 98 S.Ct. 1816, 1825 n.18, 56 L.Ed.2d 596 (1978).

8. The warrantless inspection procedure of the 1977 Act only differs from the 1969 Act in that it specifically allows a representative of the mine operator to accompany an MSHA official during an inspection.

Amendment. *See Youghiogheny and Ohio Coal Co. v. Morton,* 364 F.Supp. 45, 48 (S.D. Ohio 1973); *United States v. Consolidation Coal, supra,* 560 F.2d at 214, 219.

 The district court was correct in holding that Lucas conducted no search once within the mine office. MESA officials, according to Jasper Cornett, the vice president of the coal companies, regularly made use of the books kept on the table inside the mine office. The records were open for inspection at all times. MESA officials had never been denied access to them. Moreover, the entry was made at a reasonable time, during a regular mining shift when people were on the premises. There is no evidence that Lucas intruded into any area other than where these books were kept and to which MESA had access. Lucas did not enter for the purpose of inspecting private areas within the mine offices.

The coal companies do not challenge the authority of Lucas to enter the mine offices under normal investigatory procedures. They argue, however, that this particular entry was unlawful because of the intruding mine inspector's ulterior motive. The acquiescence of the operator to the normal investigating entry may be explained by its submission to lawful authority provided in the Coal Mine Health and Safety Act of 1969. 30 U.S.C. § 813(b). Entry to the mine offices at reasonable times and in a reasonable manner is itself legal. *United States v. Consolidation Coal, supra.* There cannot be, however, any rummaging or further intrusion once within the office, *Marshall v. Nolichuckey Sand,* 606 F.2d 693 (6th Cir. 1979).

We need not adopt here a mode of analysis by which the constitutionality of the inspector's entrance into the mine office is to be judged by his purpose for entry. The inspector did not carry on an offensive search. He entered the mine office during reasonable hours and went only to areas where the records were maintained in part for MESA inspection. It was an entry to which the mine operator had always consented.

Our inquiry therefore narrows to whether the seizure of the records violates the Fourth Amendment.

## V.

 Any inquiry into the validity of the seizure of the records must begin with the general rule that warrantless searches and seizures are *per se* unreasonable under the Fourth Amendment. *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967); *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). The Warrant Clause of the Fourth Amendment protects commercial dwellings as well as private homes. *Marshall v. Barlow's, Inc., supra.* The purpose behind the warrant requirement is to insure that the judgment of a neutral and detached magistrate is imposed against the unbridled discretion of an official caught up in the heat of an investigation. *United States v. Chadwick,* 433 U.S. 1, 9, 97 S.Ct. 2476, 2482, 53 L.Ed.2d 538 (1977); *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 468 (1948).

### A.

The government argues with great force that because the Coal Mine Health and Safety Act of 1969 specifically required the operator to maintain the seized records and keep them open to inspection, there is no expectation of privacy which justifies their suppression.

We cannot agree that these records are of interest or importance only to the government. It is not uncommon for records required by statute to serve multiple purposes. They may be used in the day-to-day operation of the coal mine. It is important for management to know the physical conditions within the mine. The miners also clearly benefit from having the records present at the mine site. Without them, the miner loses the protection afforded by knowing the location of dangerous areas within a mine. The records provide a medium whereby different shifts of miners may communicate with each other concerning

mine conditions. The records may also be of use when a dangerous condition or accident increases the peril of mining coal, in locating the cause of the condition, or perhaps in determining its scope, thereby indicating how much of the mine may continue in operation.

The Coal Mine Health and Safety Act itself indicates that the coal mine operator has at least some interest in having the record books on its premises. The Act gives the Secretary authority to obtain a district court order should the operator fail to give the Secretary access to the records or allow them to be copied. 30 U.S.C. § 818(f). Thus there exists a statutory remedy where access to the records is refused. This provision has been interpreted as one of the elements of the Act which preserve its constitutionality after *Marshall v. Barlow's, supra*, specifically because it provides the opportunity for the protection of privacy expectations. *Marshall v. Nolichuckey Sand, supra. Marshall v. Texoline*, 612 F.2d 935 (5th Cir. 1980); *Marshall v. Stoudt's Ferry Preparation Co., supra.*[9]

■ The Act also allocates the burden of investigating accidents upon the operator of the coal mine.[10] 30 U.S.C. § 821. If the companies may be deprived of the records necessary for such investigation, they will not be able to comply with their statutory responsibility. The importance of the investigation of accidents may be gleaned from an examination of the legislative history of the 1977 Act:

Such investigations shall be made and records kept whether or not the accident results in injury or death. Every accident must be investigated by an operator both to determine its cause and to ascertain the means to prevent recurrence. This provision reasserts the Committee's

view that the primary responsibility for mine safety and health is the operator's and requires the operator to maintain a continuing program for mine safety and health. Such accidents may forewarn mine operators of potential hazards, and they should thus be investigated, and remedial action should be taken regardless of whether actual injuries occurred.

S.Rep. 95–181, 95th Cong., 1st Sess. 29, *reprinted* in [1977] U.S.Code Cong. and Admin.News, 3401, 3428.

■ In addition, the Act provides that the records shall be open for inspection by "interested persons," 30 U.S.C. § 863(d)(1), (f), (g), (w). Congress intended this term to encompass not only those associated with the mine, but to include the public. H.R. Rep.No.91–563, 91st Cong., 1st Sess., reprinted in [1969] U.S.Code Cong. and Admin.News, 2503, 2544. This interest is adversely affected by allowing the warrantless seizure of records from the mine offices.

Further, the records kept by the mine company are not public property. Unlike the public gas rationing coupons involved in *Davis v. United States*, 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453 (1945), the records of conditions in the coal mine were created by the efforts of the employees. The coal companies were not acting as custodian for public property. Rather they were creating private property subject to inspection by the public. The coal companies create the records, furnish the materials on which they are kept, and possess them on their realty for use in business.

### B.

■ This panoply of interests leads us to conclude that it was not proper for the mine

---

**9.** The district court in *Marshall v. Stoudt's Ferry Preparation Co.*, 602 F.2d 589, 594 (6th Cir. 1979), imposed a requirement of confidentiality on the search. The court explained that the purpose of allowing refusal of official entry followed by a court determination of the interests involved is to protect any unusual expectations of privacy.

**10.** Although the Secretary is given the power to subpoena documents to investigate an accident, this power has been explicitly limited to investigations in connection with public hearings. *United States v. Consolidation Coal Co.*, 560 F.2d 214, 219 n.10 (6th Cir. 1977), *vacated and remanded*, 436 U.S. 942, 98 S.Ct. 2841, 56 L.Ed.2d 783 (1978), *judgment reinstated*, 579 F.2d 1011 (6th Cir. 1978), *cert. denied*, 439 U.S. 1069, 99 S.Ct. 836, 59 L.Ed.2d 34 (1979).

inspector to have removed the records in the absence of specific consent or an administrative warrant authorizing such action. We do not feel, however, that the operator's interest in the records requires their suppression, particularly in light of the statutory regulation which applies to the coal mining industry.

Although warrantless searches and seizures are *per se* unreasonable under the Fourth Amendment, *Katz v. United States, supra,* Justice Stewart explained:

> [F]or the Fourth Amendment protects people, not places. *What a person knowingly exposes to the public, even in his own* home or *office, is not a subject of Fourth Amendment protection.* See *Lewis v. United States,* 385 U.S. 206, 210 [87 S.Ct. 424, 427, 17 L.Ed.2d 312]; *United States v. Lee,* 274 U.S. 559, 563 [47 S.Ct. 746, 748, 71 L.Ed. 1202]. But what he seeks to preserve as private even in an area accessible to the public, may be constitutionally protected.

*Id.* 389 U.S. at 351–52, 88 S.Ct. at 511 (emphasis added). The coal operator knowingly exposes the records to public scrutiny. They are open for inspection not only by the regulatory agency, but by interested persons, a term Congress intended to broadly include the public at large. H.Rep.No. 91–563. The operator in this case does not even pretend that it intended to preserve the contents of the record books as private. They were kept on a table in an area of the mine office where they could be viewed by persons "who came in or out." [11]

It is true that under the statutory scheme, the interest which the mine operator has in the records and which was disturbed here is more akin to a property or a possessory interest, an interest which the Supreme Court has held is not necessarily sufficient to create a legitimate expectation of privacy. *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 430 (1978); *United States v. Salvucci,* 448 U.S. 83, 91–92, 100 S.Ct. 2547, 2252–53, 65 L.Ed.2d 619 (1980). At the same time we are reluctant to hold that the interest is possessory alone in view of the other values which attach to the use and maintenance of the records at the coal mine office. Nevertheless, however that interest may be described, it is a substantially diminished interest in view of the rights which the statute creates in the public and in the government. It is this consideration which leads us to conclude that even if such an interest is not entirely without Fourth Amendment protection, the remedy of suppression through use of the exclusionary rule is not appropriate. [12]

 In conclusion, there was no unconstitutional search conducted by the MESA inspector in reaching the records. There was a seizure of property by an inspector who had broad access to it in a closely regulated industry. Since the interest which the coal companies have in the records is not at the core of Fourth Amendment protection, we find that their suppression is not justified, absent an offensive search leading to their seizure. [13]

Accordingly, the judgment of the district court is reversed.

WISEMAN, District Judge, concurring in the result.

I concur in the result reached by Judge Engel that the fourth amendment does not

---

11. We do not decide what result would follow if the records were open only for inspection by the regulatory agency. We deal only with the situation of a pervasively regulated industry where the statutorily required records are open for inspection both by the regulatory agency and the public.

12. In so ruling, we do not, therefore, address the equally difficult question of remedy should the government, after having returned the documents pursuant to the district court's order, have subsequently obtained possession once more through use of an otherwise valid administrative search warrant.

13. Since we decided that a warrant was not necessary in this case, we need not reach the government's arguments that circumstances surrounding the seizure brought it within one of the exceptions to the warrant requirement. However, we agree with the district court that exigent circumstances did not justify the seizure of the records. We also do not find clearly erroneous the finding that the coal mine operator did not consent to the seizure.

require suppression of the mining records, and the consequent reversal of the district court. I would go further and hold, however, that the government's seizure of these open records implicated no privacy interests protected by the fourth amendment. I disagree with Judge Engel's holding that defendants' interest in maintaining control of these records was entitled to a measure of fourth amendment protection, despite the lack of a legitimate expectation of privacy in regard to the contents of the books. The seizures interfered only with defendants' possession of the records, an interest unprotected by the fourth amendment. *See United States v. Salvucci*, 448 U.S. 83, 91–92, 100 S.Ct. 2547, 2252–53, 65 L.Ed.2d 619, 628 (1980).

I think it should be emphasized that the Court's disposition of this case is in no way authority for the view that government agents are entitled to cart off a company's property whenever they are lawfully on business premises, even when that property is maintained for governmental inspection. Most importantly, the fifth amendment protects ownership interests through its prohibition against deprivations of property without due process. In cases of due process violations, government agents could be liable for damages in a *Bivens*-type civil action, even though the seized evidence would be admissible in a criminal case. *Cf. G. M. Leasing Corp. v. United States*, 429 U.S. 338, 352 n.18, 97 S.Ct. 619, 628 n.18, 50 L.Ed.2d 530 (1977) (observing that tax seizure cases center upon the due process clause of the fifth amendment, not the fourth amendment). Government agents who might view the Court's holding as general authority for random seizures of personal property that might be susceptible to warrantless inspections do so at their own peril.

Judge Engel's opinion implicitly recognizes that this case is not controlled by this circuit's decision in *United States v. Consol-*

*idation Coal Co.*, 560 F.2d 214 (6th Cir. 1977), *vacated and remanded*, 436 U.S. 942, 98 S.Ct. 2841, 56 L.Ed.2d 783 (1978), *judgment reinstated*, 579 F.2d 1011 (6th Cir. 1978), *cert. denied*, 439 U.S. 1069, 99 S.Ct. 836, 59 L.Ed.2d 34 (1979). I find it necessary to address the case more fully, however, because of the district court's reliance on *Consolidation Coal* and because that case figured prominently in the briefs and oral arguments on this appeal. In my opinion, neither today's decision nor the Supreme Court's ruling in *Donovan v. Dewey*, 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981), affects the actual holdings of *Consolidation Coal*; however, in light of *Donovan* and today's decision, it is apparent that certain dicta in that case no longer reflect accurately the current state of the law.[1]

The Court held in *Consolidation Coal* that the government needed administrative search warrants to search six mine offices for evidence that the defendant coal company had been submitting artificially "clean" dust samples to the monitoring agency. (These samplings were required by 30 U.S.C. § 842(a)). The searches at issue in *Consolidation Coal* required warrants because the government agents invaded areas where the operator had a "general expectation of privacy." *See Marshall v. Nolichuckey Sand Co.*, 606 F.2d 693, 696 (6th Cir. 1979), *cert. denied*, 446 U.S. 908, 100 S.Ct. 1835, 64 L.Ed.2d 261 (1980). Judge Celebrezze acknowledged that the investigators had the right to make warrantless entries, 560 F.2d at 219; however, the scope of the intrusions in *Consolidation Coal* was not limited to particular areas where government agents and other members of the public routinely enjoyed free access for the purpose of record inspection. The searches extended "to locales where pertinent records and dust sampling cassettes might be stored," 560 F.2d at 220, a scope which was not narrowly limited. In con-

---

1. This is particularly true of the following statement, which the district court quoted in its memorandum opinion:

Even where a statute requires records to be maintained and authorizes on-premises inspection of them in the normal course, no precedent sanctions direct access to the records without demand in the absence of a search warrant.
560 F.2d at 217.

trast, the searches in this case were limited to areas that government agents routinely entered; these were not intrusions into areas where defendants had a general expectation of privacy, as the district court found.

Equally significant is the nature of the items seized in the respective cases. The agents in *Consolidation Coal* sought "evidentiary indicia of compliance" with section 202 of the Act, 30 U.S.C. § 842. Section 842(a) required the transmittal of dust samples to the monitoring agency, but it did not require operators to make records of any sort available for inspection on the premises. This necessarily means that the items seized in *Consolidation Coal*[2] were not records maintained in compliance with the Act, and thus the defendant retained a significant expectation of privacy as to their contents. On the other hand, all the books seized in the instant case were maintained for public inspection, as required by statute. 30 U.S.C. § 863(d)(1), (f), (g), (w). Consequently, defendants in the instant case had no expectation of privacy in regard to the contents of the records seized. *Cf. United States v. Miller*, 425 U.S. 435, 443, 96 S.Ct. 1619, 1624, 48 L.Ed.2d 71 (1976) (individual has no expectation of privacy in regard to his banking records). As Judge Celebrezze recognized, there is "virtually no expectation of privacy in records" maintained in compliance with the Act. 560 F.2d at 220–21.

Although Consolidation Coal Co. was engaged in a closely regulated business, the searches in that case required warrants because the governmental action impinged upon privacy interests that the company still retained, despite its pervasive regulation. *Consolidation Coal* is fully consistent with *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313–14, 98 S.Ct. 1816, 1820–21, 56 L.Ed.2d 596 (1978), as this Court found in its response to the Supreme Court's remand for reconsideration in light of that case. *United States v. Consolidation Coal Co.*, 579 F.2d 1011 (6th Cir. 1978). It is also consist-

ent with the Supreme Court's *Donovan* decision. The entries in the instant case required no warrant, however, because defendants had no general expectation of privacy in either the premises entered or the records sought.

Warrants are necessary to check the "unbridled discretion" of government agents as to when, where, and whom to search. *See Marshall v. Barlow's, Inc., supra,* 436 U.S. at 323, 98 S.Ct. at 1826. That discretion was sufficiently limited in this case, because the agents were only authorized to search for records maintained for MESA inspection in areas freely accessible to MESA agents and other members of the public. Having achieved access to those records, their seizure infringed upon no additional privacy interest. To quote from *Donovan v. Dewey, supra,* "[u]nder these circumstances, it is difficult to see what additional protection a warrant requirement would provide." 452 U.S. at 605, 101 S.Ct. at 2541, 69 L.Ed.2d at 273. To require a warrant in these circumstances would dilute the importance of warrants in other factual settings where the scrutiny of a neutral magistrate serves to protect important civil liberties. *See* 1 W. LaFave, Search and Seizure § 2.1(e) (1978).

KEITH, Circuit Judge, dissenting.

I cannot agree with either Judge Engel's or Judge Wiseman's analysis, therefore I respectfully dissent.

I.

Judge Wiseman concludes that the Coal Mine Health and Safety Act of 1969 ("Act"), 30 U.S.C. § 863, eliminated any expectation of privacy Blue Diamond Coal Company ("Blue Diamond") had in its records. I agree with Judge Engel that this position is incorrect. The Act does authorize inspection of the records by the Mine Enforcement and Safety Administration ("MESA") inspectors, but the remedy provided by the Act in case of noncompliance is federal district court action. 30 U.S.C. § 818(f). If the inspectors had a reasonable

**2.** The government seized a substantial volume of records and documents, a number of metal file cabinets and file card drawers, as well as several sampling cassettes. 560 F.2d at 216 n.5.

fear that Blue Diamond would destroy or falsify the records in order to cover up mine safety violations, the proper remedy would be court action. However, in the instant case, the federal investigators resorted to self-help.

## II.

Judge Engel's position is that the Act so diminished Blue Diamond's interest in controlling its records "that even if such an interest is not entirely without Fourth Amendment protection, the remedy of suppression through use of the exclusionary rule is not appropriate." I disagree. The remedy of suppression through the use of the exclusionary rule is mandatory and in accordance with standard search and seizure analysis. The search of Blue Diamond's records was beyond the scope of the consent imposed by the Act.

Even for purely administrative inspections, entry by government officials onto private property for inspection purposes ordinarily requires issuance of a warrant. *See v. City of Seattle*, 387 U.S. 541, 545, 87 S.Ct. 1737, 1740, 18 L.Ed.2d 943 (1967); *Camara v. Municipal Court*, 387 U.S. 523, 534, 87 S.Ct. 1727, 1733–34, 18 L.Ed.2d 930 (1967). In *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 77, 90 S.Ct. 774, 777, 25 L.Ed.2d 60 (1970), the Supreme Court explained: "where Congress authorized inspection but made no rules governing the procedure that inspectors must follow the Fourth Amendment and its various restrictive rules apply." Therefore, prior to the Act, Blue Diamond had a legitimate expectation of privacy, both in their offices and in the contents of the record books. Clearly, it would have been a Fourth Amendment violation for MESA agents to enter Blue Diamond's offices without a warrant, open their record books, and search through their contents. However, the Act, a comprehensive regulatory statute, limited the scope of Blue Diamond's expectations of privacy and enabled MESA agents to make certain inspections of records and books which would otherwise violate the Fourth Amendment. See *Donovan v. Dewey*, 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981).

The Act authorizes warrantless inspections of certain record books of mine operators. Pursuant to the procedures articulated in the Act, government agents have the "right to entry to, upon, or through any coal mine" to make certain inspections or investigations. 30 U.S.C. § 813(b)(1). The mine conditions and health and safety standards compliance record books are also subject to inspection. 30 U.S.C. § 863(d)(1), (f), (g), (w). The record books must be "maintained in an area on the surface of the mine chosen by the mine operator to minimize the danger of destruction by fire or other hazard." *Id.* The Act does not, however, authorize the government to take possession of the record books, compliance data, or any other private property of the operator. In fact, only a subpoena authorizes the government to physically take possession of the records absent a search warrant. 30 U.S.C. § 813(d). The government's right of possession does not vest until a public hearing has been called to investigate a mining accident. *Id.*

The search provisions of the Act are an exemption to the warrant requirement of the Fourth Amendment. Searches and inspections conducted pursuant to and in full compliance with the Act's congressionally articulated procedure are reasonable and are not Fourth Amendment violations. The Act's search procedures are carefully limited in time, place and scope. *See United States v. Biswell*, 406 U.S. 311, 315, 92 S.Ct. 1593, 1596, 32 L.Ed.2d 87 (1972); *Donovan v. Dewey, supra.* These procedures allegedly provide "substantially the same assurances [as a warrant]." *United States v. Martinez-Fuerte*, 428 U.S. 543, 565, 96 S.Ct. 3074, 3086, 49 L.Ed.2d 1116 (1976). The rationale underlying this limited exemption is that businessmen involved in closely regulated industries such as mining, "accept the burdens as well as the benefits of their trade." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313, 98 S.Ct. 1816, 1821, 56 L.Ed.2d 596 (1978). "The businessman in regulated industry in effect *consents* to the restrictions placed upon him." *Id.* (Emphasis added).

This consent is merely a legal fiction imposed on the mining industry. The fiction-

alized consent in effect, and in reality, waives Fourth Amendment rights guaranteed in the text of the Constitution. The waiver or consent imposed by the Act, however, is a limited one. Mine operators, such as Blue Diamond, have only consented constructively to inspections and searches conducted in accordance with the Act. "[C]onsent searches are reasonable only if kept within the bounds of the actual consent." *United States v. Griffin*, 530 F.2d 739, 744 (7th Cir. 1976). *See, e.g., Mason v. Pulliam*, 557 F.2d 426, 429 (5th Cir. 1977) ("when the basis for search or seizure is consent, the government must conform to the limitations placed upon the right granted to search, seize or retain the papers or effects."); *Oliver v. Bowens*, 386 F.2d 688, 690 (9th Cir. 1967); *United States v. Dichiarinte*, 445 F.2d 126, 129 (7th Cir. 1971). Searches which exceed the scope of consent violate the Fourth Amendment. *Id.*

The Act indicates that MESA inspectors may visually inspect, search through, and copy the operator's records while those records are at the mine site. The record books are the operator's private property. The Act does not empower the MESA inspectors to take the records from the mine site. Yet, all parties in this action admit that the MESA agents did precisely what the Act does not authorize them to do. MESA agents entered the operator's offices, illegally seized the record books, and transported them to the MESA offices in Whitesburg, Kentucky. At least two days after their initial seizure, MESA agents opened the various records and searched through their contents in the Whitesburg offices.

The fictional "consent" or waiver of Fourth Amendment rights imposed by the Act is limited to inspections and searches conducted at the mine site. The seizure and transportation of the record books from the mine site to Whitesburg exceeded the scope of the narrow exception to the Fourth Amendment that the Act created. Blue Diamond did not voluntarily consent to the taking or the subsequent search. The trial court specifically found that Blue Diamond had not consented to the search of the office or the seizure of the records. This finding is not clearly erroneous. Therefore, once the record books were seized and illegally transported from the mine site, Blue Diamond's expectations of privacy were violated. Blue Diamond unquestionably had a right to exclude everyone not at the mine site from viewing the records first hand. The subsequent warrantless searching through the records which occurred in Whitesburg at least two days after the illegal seizure violated the Fourth Amendment.

Moreover, on these facts, there is simply no evidence that Blue Diamond would not accurately document its investigation of the accident. The report would have been made available to MESA officials. 30 U.S.C. § 863(d)(1). Significantly, there were other statutorily approved procedures MESA officials could have used to obtain Blue Diamond's records. 30 U.S.C. § 813(b). It is not advisable to sanction such blatant violations of Fourth Amendment rights as occurred in the instant case. Accordingly, I would affirm Judge Hermansdorfer's holding that the records obtained in violation of the Fourth Amendment was subject to the exclusionary rule.